INDIANA QUARTERED OAK CO. v.
FEDERAL TRADE COMMISSION.

Circuit Court of Appeals, Second Circuit.
May 14, 1928.

No. 271.

1. **Trade-marks and trade-names and unfair competition** ☞80½—**Fact findings of Federal Trade Commission, supported by any evidence, are binding on courts.**

Findings of fact by the Federal Trade Commission, having any evidence to support them, are conclusive, and binding on courts reviewing the weight of the testimony.

2. **Trade-marks and trade-names and unfair competition** ☞80½—**That term "Philippine mahogany" has acquired secondary meaning, to include woods not in mahogany family, held not to avoid charge of deceiving public (Federal Trade Commission Act, § 5 [15 USCA § 45]).**

That term "Philippine mahogany" may have acquired a secondary meaning in the trade, to include woods found in Philippine Islands which do not belong to mahogany tree family, botanically or otherwise, *held* not to permit petitioner to escape charge of deception or of misleading public, under Federal Trade Commission Act, § 5 (15 USCA § 45), where understanding that Philippine mahogany is not mahogany is limited to dealers actually selling rough lumber.

3. **Trade-marks and trade-names and unfair competition** ☞80½—**Sale of woods not in mahogany family as "Philippine mahogany" held unfair competition, of which Federal Trade Commission could assume jurisdiction in public interest (Federal Trade Commission Act, § 5 [15 USCA § 45]).**

Advertising and sale of inferior woods not belonging to mahogany tree family as "Philippine mahogany," resulting in deceiving purchasers into believing woods are true mahogany, *held* unfair method of competition, justifying Federal Trade Commission in assuming jurisdiction in the public interest, under Federal Trade Commission Act, § 5 (15 USCA § 45).

Petition to Review Order of Federal Trade Commission.

Petition by the Indiana Quartered Oak Company to review an order of the Federal Trade Commission requiring petitioner to desist from advertising, describing, selling, or offering for sale under the term "mahogany," or "Philippine mahogany," woods which are imported from the Philippine Islands. Order affirmed.

Charles Neave, of New York City (Daniel R. Forbes, of Washington, D. C., and Alexander C. Neave, of New York City, of counsel), for petitioner.

F. Granville Munson, Major, Judge Advocate, U. S. Army, of Washington, D. C., for government of Philippine Islands.

Robert E. Healy, Chief Counsel, Adrien F. Busick, Asst. Chief Counsel, and M. Markham Flannery, all of Washington, D. C., for respondent.

Marcus Borchardt, of Washington, D. C., George Gordon Battle, of New York City, and Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Havens Grant, of New York City, of counsel), amici curiæ.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. The Federal Trade Commission, after protracted hearings, resulting in a very large record, by its order restrained the petitioner from "advertising, describing, or otherwise designating or selling, or offering for sale, under the term 'mahogany' or 'Philippine mahogany,' * * * woods known under the common or trade names 'red lauan,' 'white lauan,' 'tanguile,' 'narra,' 'apitong,' 'bataan,' 'lamao,' 'orion,' 'batang,' 'bagaac,' 'batak,' and 'balachacan,' * * * unless such wood * * * from which products are made is derived from the trees of the mahogany or Meliaceæ family."

The Commission made findings, supported by evidence, to which exceptions are taken, that the woods have been known and traded in for years, both in the Philippines and in the United States, under the names of "lauan" and "tanguile," and having other trade-names as referred to in the order of the Commission; that about 85 per cent. of the Philippine woods sold as "Philippine mahogany" is imported through the Pacific Coast ports under the other trade-names as set forth; that some importers sell these woods to lumber dealers and furniture manufacturers under their native or trade names. It also found that a substantial number of lumber dealers in this country use and deal in woods of the type sold by the respondent as Philippine mahogany under such native or trade names.

There is a conflict of evidence as to the tree family of these woods, but there is evidence to support the finding of the Commission that the lauan and tanguile sold by respondent as Philippine mahogany is the product of the tree family scientifically known as Dipterocarpaceæ, which tree family is not scientifically or botanically related to the tree family Meliaceæ, the product of which constitutes true mahogany. Of the genera of this Meliaceæ family, but one, Swietenia, produces true mahogany, and there are five known species of Swietenia. The Commission has found that trees of the Swietenia group producing mahogany grow principally in the West Indies, southern Florida, southern Mexico, Central America, Venezuela, and Peru, and it also has found that

no species of the genus Swietenia of this tree family grows in the Philippine Islands, except such as are planted for decorative or experimental purposes. There is evidence to support the finding that the Spanish words "Caoba des Filipinos," which means Philippine mahogany, are used to designate native woods resembling mahogany in grain, texture, and color, but, while the term was known in the Philippines, it was not used in connection with the sale of lumber.

The term "Philippine mahogany" was not used prior to the American occupation, and it appears that, prior to 1916, the Philippine government, through its Director of Forestry, opposed the practice of American importers selling Philippine hardwoods as "Philippine mahogany." Woods of widely different kinds are shown to have properties and characteristics in common, but it is the difference in such properties and characteristics that distinguish one wood from the other, and the ultimate fact is made known by the test which consists in comparison or contrast of such properties and characteristics. Men engaged in the lumber business or woodworking trade recognize different woods by certain characteristics which are peculiar to these woods, and since such characteristics are produced in the growth of the tree, they are regarded as botanical characteristics, and are considered in classifying or identifying the different kinds of wood which the lumber or woodworking trade handles.

The Commission has found that laborers in the lumber yard, who distinguish between the different kinds of lumber by considering the grain, pore, scent, weight, or other identifying characteristics, are guided by botanical properties and differences inherent in the wood as formed in the tree, and these characteristics correspond with like characteristics placed by nature in the trees of the same species. Wood technologists, by reason of their expert knowledge, compare these and other qualities and characteristics with such precise results as to satisfy the requirements of both science and commerce, and, according to such identification, neither lauan nor tanguile are mahogany, botanically or otherwise. It is found that many of the characteristics and virtues possessed by mahogany are lacking in the Philippine hardwood sold by the respondent as "Philippine mahogany," and this prevents such hardwoods from serving such uses for which mahogany is particularly adapted, and there is evidence to support the finding that such woods are not suitable for cabinetmaking, because of the prevalence of wormholes, which constitute

serious defects, and that they are too soft for flooring and not suitable for the construction of lamps, because they do not take the required finish; that they are not susceptible to the finish required by piano manufacturers on the exposed surfaces of pianos, nor are they suitable for carving. When used in furniture, it is necessary to fill the wormholes before the wood is stained or varnished, and such filling destroys the even appearance of the surface. They do not retain subsurface luster peculiar to mahogany, and, unlike mahogany, they do not beautify with age. The Commission has found that the general public is deceived when lauan or tanguile is sold for mahogany.

[1] It is now well settled that findings of fact by the Commission, having any evidence to support them, are conclusive and binding upon the courts reviewing the weight of the testimony. Fed. Trade Commission v. Beech Nut Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Harriet Hubbard Ayer, Inc., v. Fed. Trade Commission (C. C. A.) 15 F.(2d) 274, 276; Oppenheim, Oberndorf & Co. v. Fed. Trade Comm. (C. C. A.) 5 F.(2d) 574; Nat. Biscuit Co. v. Fed. Trade Commission (C. C. A.) 299 F. 733.

It is established that not all trees, shrubs or bushes belonging to the Meliaceæ, the mahogany tree family, produce mahogany lumber. But there is ample expert testimony establishing that no wood is mahogany unless it is wood from the tree of the mahogany tree family, and no wood is true mahogany unless it is of the genus Swietenia of that family. It becomes unnecessary for us to discuss here the difference of expert opinion as to whether the trade designation "mahogany" should be confined to one or more species of the genus Swietenia, for wood from trees which in no way belong to either the genus, or mahogany tree family, is neither true mahogany nor any kind of mahogany. And the experts justified the findings of the Commission that the woods imported from the Philippine Islands and sold by the respondent as "Philippine mahogany" are not from any tree of the Meliaceæ tree family. The Commission found that the representation of these woods as Philippine mahogany has caused dealers in the furniture and allied commodities to purchase such wood products in the belief that they are mahogany woods, and in turn to sell to retail dealers articles of furniture and allied commodities for articles of mahogany woods, which, when they ultimately reach the consuming public, become a fraud upon it. It found that such sales and practices deceived a substantial por-

tion of the trade, and the purchasing public in substantial numbers, because such purchases were made or induced under the belief that they were products made of true mahogany, and therefore there was injury to the purchasing public and to the honest competitors of the petitioner: To support this finding, there was much testimony of witnesses who were engaged in the furniture business for a long period of years.

[2] If, as argued by the petitioner, the term "Philippine mahogany" has acquired a secondary meaning, in that the trade does not understand it to mean genuine mahogany, but a wood having some of the characteristics and qualities of mahogany, that will not permit the petitioner to escape the charge of deception or misleading the public. The trade, as a whole, does not understand that "Philippine mahogany" is not mahogany, but such understanding is limited to dealers who actually sell the rough lumber. Retailers of furniture, builders of houses and boats, testified that they understood the word to mean genuine mahogany. Indeed, some of the manufacturers of furniture, who used the lumber as a raw material, do not understand that it is not true mahogany. If the term deceives the purchasing public, its use may not be continued. As said in Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729:

"While it is true that a secondary meaning of the word 'Merino' is shown, it is not a meaning so thoroughly established that the description which the label carries has ceased to deceive the public; for even buyers for retailers, and sales people, are found to have been misled. * * * The fact that misrepresentation and misdescription have become so common in the knit underwear trade that most dealers no longer accept labels at their face value, does not prevent their use being an unfair method of competition. A method inherently unfair does not cease to be so because those competed against have become aware of the wrongful practice. Nor does it cease to be unfair because the falsity of the manufacturer's representation has become so well known to the trade that dealers, as distinguished from consumers, are no longer deceived."

False advertising and selling the commodity as and for a different commodity has been denounced by the courts as a method of unfair competition, within the meaning of the statute here invoked. Proctor & Gamble Co. v. Fed. Trade Commission (C. C. A.) 11 F. (2d) 47; Guarantee Veterinary Co. v. Fed. Trade Commission (C. C. A.) 285 F. 853; Royal Baking Powder Co. v. Fed. Trade Commission (C. C. A.) 281. F. 744. The same rule obtains in the English courts. Lemy v. Watson [1915] 31 L. T. 612, and Steinway v. Henshaw, 5 R. P. C. 79.

[3] It was the petitioner's advertising of lauan and tanguile woods as "Philippine mahogany" that has worked deception upon the public. Purchasers from petitioner have relied upon its representations and have sold the products made from these Philippine woods as mahogany. Mahogany wood has had a long-established reputation; deception on the public in the sale of inferior woods, which are not true mahogany (which deception reaches the ultimate purchaser, even though the intermediate customers knew that the woods were not mahogany), is an unfair method of competition in commerce, under section 5 of the Trade Commission Act (38 Stat. 717, 719 [15 USCA § 45]). Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161; Coca-Cola Co. v. Gay-Ola Co. (C. C. A.) 200 F. 720.

It was not necessary for the Commission to establish intent to deceive the purchasing public; for the test of unfair competition was whether the natural and probable result of the use by the petitioner of such woods was deceptive to the ordinary purchaser, and made him purchase that which he did not intend to buy. Fed. Trade Commission v. Balme (C. C. A.) 23 F.(2d) 615; Straus v. Notaseme Hosiery Co., 240 U. S. 179, 182, 36 S. Ct. 288, 60 L. Ed. 590.

It is argued that there is a want of public interest, and that the Federal Trade Commission was not justified in assuming jurisdiction under section 5 of the Federal Trade Commission Act (38 Stat. 717, 719). That act provides that, "if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public," jurisdiction may be taken by the Commission.

The practices here involved affect the public, who buy furniture and other products manufactured from mahogany wood, as well as intermediate dealers in mahogany, and this was sufficient to sustain the trade commission in assuming jurisdiction. Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729.

Order affirmed.

SWAN, Circuit Judge. I reluctantly concur in the result, because the Commission has made findings of deception of the public, which there is some evidence to support, though in my opinion it is greatly outweighed

by contrary evidence. The purchasing public knows little, and cares less, I think, about the botanical characteristics of mahogany. The Philippine government, our own Departments of War, Commerce, and Agriculture, and the Interstate Commerce Commission have been accustomed for years to refer to the woods in question as "Philippine mahogany." The National Hardware Lumber Association has, since 1916, established rules for grading "Philippine mahogany." This term is used in foreign countries also. Combined with the word "Philippine," "mahogany" is used in its commercial, as distinguished from its botanical, sense. Such usage is common in the lumber industry. Witness: Douglas fir or Oregon pine, which is a false hemlock; red cedar, which is a juniper; and many other instances which might be cited. Interference with such commercial usage does not seem to me justifiable, but in view of the Commission's findings, the court is powerless.