## MASLAND DURALEATHER CO. et al. v. FEDERAL TRADE COMMISSION.

Circuit Court of Appeals, Third Circuit.
September 18, 1929.

(No. 4085.)

Robert T. McCracken and C. Russell Phillips, both of Philadelphia, Pa., for petitioners.

Robert E. Healy, Edward J. Hornibrook, and Adrien F. Busick, all of Washington, D. C., for respondent.

Before WOOLLEY and DAVIS, Circuit Judges, and RELLSTAB, District Judge.

RELLSTAB, District Judge. The Masland Duraleather Company, a Pennsylvania corporation, and W. & J. Sloane, a New Jersey corporation, jointly petition this court to review and set aside an order made by the Federal Trade Commission, commanding them to cease and desist from using the term "Duraleather" as a trade-name on imitation leather, on their stationery, in their advertisements of the product, and "from using the word leather or any other word or combination of words in such manner as to import or imply that such products are real leather."

The respondent hereafter will be called Commission, and the petitioners, when separately referred to, will be termed Masland Company and Sloane, respectively.

The Commission, in that part of its answer which is in the nature of a cross-bill, prays for a decree affirming this order and requiring petitioners to conform thereto.

The challenged order is the result of proceedings instituted by the Commission, pursuant to the act of September 26, 1914, 38 Stat. 717 (15 USCA §§ 41–51), entitled "An Act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," in which it was charged that petitioners were using unfair methods of competition in interstate commerce in violation of the provisions of section 5 of that act (15 USCA § 45).

The decried business methods and their alleged consequences are set out in two counts. Both deal with petitioners' use of an alleged false and misleading trade-name in marking, advertising, and marketing their artificial leather product, and the results thereof. The first relates to competition in the pertinent trade generally, while the second is confined to a particularly named alleged competitor.

The Commissioner's findings underlying this order, pertinent or necessary to be understood on this review, somewhat abbreviated, are:

That the Masland Company is "engaged in the manufacture of a product which it calls 'Duraleather,' an imitation or artificial leather"; that Sloane is engaged in selling and distributing this product "to manufacturers of automobiles, automobile bodies, trunks, suitcases, satchels, upholstered articles and other similar products, who manufacture many of said products in whole or in part of said imitation or artificial leather"; that petitioners compete with others making "leather and imitation or artificial leather," who sell the same throughout the United States; that petitioners' product contains no leather, but is painted and embossed with a grain closely resembling genuine leather; that the manufacture of this imitation leather was begun in 1914 by Walter E. Masland, individually, who designated it as "Duraleather"; that since its incorporation (1919) the Masland Company continued this manufacture and designation; that prior to 1924 Masland Company branded its imitation leather with the word "Duraleather" and so advertised it without explanation that it was artificial and in imitation of genuine leather; that since 1924 Masland Company "has used the term 'Duraleather' in branding, labeling, designating and advertising its said imitation or artificial leather, which term is printed in very conspicuous type and is also accompanied with the phrase 'The Durable Leather Substitute' in letters of less conspicuous type"; that samples of this imitation leather, sent to customers and prospective customers before 1924, "bore the word 'Duraleather' without explanation that the product was imitation or artificial"; that since 1924 "these samples have borne the word 'Duraleather' in conspicuous letters and the words 'A Durable Leather Substitute' in letters so small as to be hardly discernible to the human eye"; that "Duraleather" is frequently billed to customers of petitioners by Sloane, without explanation on the billing or invoice that the same is imitation or artificial; that on orders to imitate samples of genuine leather furnished by persons desiring such imitation, Masland Company endeavors to make this particular imitation; that in 1923 the Virginia Trunk & Bag Company purchased from one of the jobber customers of petitioners a quantity of "Duraleather," which it used in making traveling bags and suitcases, and which it sold in several of our states as "Duraleather" bags, "Duraleather" suitcases, and "Duraleather" overnight bags, without explanation that the same were made of artificial or imitation leather, and that in the same year this company issued more than 10,000 catalogues and circulars "in which some of its bags and suitcases were described as 'black cobra grained Duraleather,' without explanation that the same were made from imitation leather"; that the reason this company "used the word 'Duraleather,' as above described, was because such name was given to the prod-

uct by the manufacturers thereof"; that among the competitors of petitioners is A. C. Lawrence Leather Company, which is engaged in the manufacture of genuine leather, which it sells to makers of shoes, luggage, upholstered furniture, automobiles, novelties, and other products, located in several States; that this company for more than 25 years used its registered name, "Duro," as a trade-name for calfskin and veal skin leathers made and sold by it, and advertised this trade-name in connection with its said products as "Duro calf," "Duro veal," and "Duro calf leather"; that this company successfully opposed the registration by Masland Company of the word "Duraleather"; that there is a similarity between the designated products of this company and the "Duraleather" made by the Masland Company; that the use by petitioners "of the trade-name 'Duraleather' has the capacity and tendency to mislead and deceive the consuming public into the belief that said 'Duraleather' is a product of the aforesaid competitor and to cause the consuming public to purchase articles made in whole or in part from 'Duraleather' in such belief"; that petitioners' use of the term "Duraleather" as applied to their imitation leather suggests the use of that term by their customers or the latters' customers "in the marketing and sale of products made in whole or in part of 'Duraleather' "; that such uses have "the tendency and capacity to divert trade from those who are engaged in the manufacture of real leather and those who are engaged in the manufacture of imitation leather and selling and advertising the same as such imitation leather"; that such uses also have "the capacity and tendency to deceive the consuming public into the belief that the articles made therefrom are made from genuine leather and to cause the consuming public to purchase the same in such belief"; and that petitioners' recited "acts and practices place in the hands of others the means of committing a fraud upon the consuming public by enabling dealers to offer for sale and sell to the consuming public articles made from 'Duraleather' as and for articles made of real leather."

These findings are challenged in the following summarized particulars:

That the name of petitioners' product since 1924 has not been "Duraleather," but "Duraleather, the Durable Leather Substitute," and that this amplified name is clearly legible.

That there is no evidence (a) of competition between petitioners and A. C. Lawrence Leather Company; (b) or between them and any manufacturer of genuine leather; (c) or

that the public, or any one, has been, or is likely to be, deceived by such amplified name; (d) or that sales of this product were made without knowledge on the part of, or explanation to, purchasers that it was imitation leather; (e) that any one was, or is likely to be, deceived into the belief that the product was genuine leather; (f) or that the amplified name suggests to customers a product made therefrom as being made of leather or "Duraleather"; (g) or that thereby any trade has been, or is likely to be, diverted from manufacturers of real leather; (h) or that the consuming public has been, or is likely to be, deceived into the belief that articles made from that product are made from genuine leather; (i) or that the consuming public has been misled into purchasing such articles as a result of any such belief; (j) or that petitioners' use of that amplified name, places, or is likely to place, in the hands of others the means of deceiving the public into believing that such articles are made of real leather.

In dealing with these alleged errors, we must bear in mind that by section 5 of the act referred to (15 USCA § 45), "the Commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the acts to regulate commerce, from using unfair methods of competition in commerce," and that its findings as to facts, if supported by testimony, are made conclusive. Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729; Curtis Pub. Co. v. Federal Trade Commission (C. C. A. 3) 270 F. 881, Id., 260 U. S. 568, 43 S. Ct. 210, 67 L. Ed. 408.

It is noted that the basic challenge relates to the trade-name, and that many of the other challenges need be considered only in case this court determines in favor of the petitioners' contention that the trade-name is not "Duraleather," but "Duraleather, the Durable Leather Substitute."

It is conceded, and the record establishes, that from 1915 to 1924 the name for this imitation leather was "Duraleather," without any additions. During this period the product in question was advertised and marketed under that trade-name, the first four years by Walter E. Masland and thereafter by his successor, the Masland Company. In 1924, for some reason not disclosed, there was added to the word "Duraleather" the phrase "The Durable Leather Substitute," from which time this amplified name has been used in marking, advertising, and marketing this imitation leather. However, the word "Duraleather," whenever it appeared with the additions referred to, was always on a line by

itself and was of much larger type than the additions, which appeared on a line below, and by far was the more prominent; and on some of the Masland Company's billheads and on one form of the Sloane tags used in labeling this product, it was made the more conspicuous by being printed in red ink in contrast with the black ink used in printing the additional phrase. On samples, this addition was in many instances hardly discernible. Undisputedly "Duraleather" was the sole name for this imitation leather for nine years. Thereafter, and seemingly purposely, it was the most conspicuous and outstanding word in the marking, advertising, and billing of this imitation leather. This "catchy" word, notwithstanding its later association with the additional phrase referred to, did not lose its significance or dominancy as the commercial signature under which the petitioners were advertising and marketing their product.

Some time subsequent to the addition of this phrase, the Masland Company advertised its imitation leather in the Decorative Furnishers Directory and Buyers' Guide, published in New York City in pocket edition form. This advertisement carried a prominently displayed cut or picture of an upholstered armchair. Above and below this cut was printed the word "Duraleather" on one line and the words "The Durable Leather Substitute" on the following line. Here also in both places "Duraleather" was printed in the larger type. The type used in printing it in the upper part of the advertisement was considerably the largest used in this advertisement, and was second only to the displayed armchair in prominence. Between the two lines of printing and immediately underneath the upper word "Duraleather," and closer to it than to the phrase "The Durable Leather Substitute," were the words "Trade Mark." The spacing and placing of these latter two words indicate that they referred to "Duraleather" and not to the phrase following.

A clipping of this advertisement was produced by the petitioners in response to the Commission's request. They obtained it from the publishers of this directory, who inclosed it with a letter dated January 17, 1928, wherein the Masland Company was asked if the advertisement was "O. K.," or whether a change was to be made therein for inclusion in its 1928 edition of the Directory. The president of the Masland Company, when questioned in advance of its production, in regard to an advertisement of this product in this directory, after stating his unfamiliarity with such matters, said this directory was a small publication and that the Masland Company "had an advertisement there possibly one or two years and then cut it out because it was of no material value."

At the time this clipping and the publisher's letter were produced, counsel for the petitioners stated that this advertisement had not been recently used.

No other testimony in relation to this advertisement was given, so that we have no means of determining the year when, or the particular edition of this guide wherein, this advertisement appeared.

On its face, it evidences that it was prepared after Masland Company had coupled its trade-name "Duraleather" with the phrase referred to. And the use of words "Trade Mark," in closer connection with the former than the latter, is evidence that at that time, whenever it was, Masland Company still considered that "Duraleather" alone was the trade-mark. How long after that Masland Company continued of the same mind is left to conjecture, as is also the reason for not furnishing any more light on that subject. However, we are not to be supposed to have given a dominating emphasis on the failure of petitioners to explain the use of the words "Trade Mark" in the connection referred to. We are satisfied that the evidence taken as a whole affecting the question now considered, not only supports the Commission's finding that "Duraleather" is the trade-name of petitioners' imitation leather, but that it fully sustains such finding.

The next question, and to our mind closely allied with the one just considered as limiting the inquiry before us, is:

*Is this name inherently false or misleading?*

Leather is the tanned skin of an animal, and the petitioners' product concededly contains no leather. It has a cotton cloth base on which is spread a coating composed of nitrocellulose solution, castor oil, and various pigments for coloring, and by painting and embossing is made to resemble real leather on the only side thereof that is exposed to view when made up into goods or used in upholstering, paneling, or trimming.

"Duraleather" is a coined word. "Dura" admittedly is an abbreviation of the word "durable," and the word thus composed can be given no other meaning than "Durable leather." So read and considered, it is an assertion that the product marked, advertised, and sold as "Duraleather" consists of leather. By putting this imitation product bearing a false name into the channels of trade, whatever may have been the petitioners' motive in so doing, they furnished their customers and

those dealing with them the means to misrepresent that the goods made from that product were made of leather, and when such a false trade-name is subsequently associated with the sale of goods made from such product, the petitioners cannot escape legal responsibility by disclaiming any intention to deceive or by showing that those with whom they dealt directly—first purchasers of the product—well knew that it was but an imitation or substitute for the genuine article. While this imitation leather, as it passed from the petitioners in the first instance, was to its customers a finished product, it was to their knowledge and purpose to be used ultimately in upholstering and in the manufacture of suitcases and other goods and to come into the hands of those usually called the consuming public.

The knowledge which these original and intermediate buyers had as to the character of the petitioners' product cannot be imputed to the ultimate buyer. There is nothing on the face of the upholstered goods and those made up in whole or in part from this imitation leather that would convey such knowledge to the buyers thereof. So far as appearances were concerned, the contrary would be the intimation. These purchasers of the goods thus made could and would see only one side of this product—that side which had been purposely made to resemble or imitate genuine leather. Masland Company concedes that many of these would have difficulty to distinguish its product thus made up from genuine leather. When these goods are unaccompanied with the name "Duraleather," as is the case in most instances, the likelihood that the purchaser thereof would be deceived into buying them, believing that they were made of genuine leather, was ever present. But when the goods so made are advertised as made of "Duraleather," as was done by the Virginia Trunk & Bag Company in its catalogues and circulars issued for 1924 use by its customers and prospective customers located throughout several of the states, and who mostly were retailers of leather and imitation leather goods, in which advertisements appeared cuts or prints of suitcases under some of which was printed the legend "Made of 'Duraleather,'" or "Made of Black Cobra Grain Duraleather," the likeness of such goods and the trade-name associated therewith in which the word "leather" was prominent, would co-operate and tend to deceive the ordinary ultimate buyer of such bags into the belief that their purchases were made of genuine leather. The price thereof, assuming that to their knowledge it was less than that of ordinary leather goods, would in many instances, probably, mean no more—if that much—than that they were made of an inferior grade of leather.

A false trade-name or one that has both the capacity and tendency to deceive the ordinary purchaser will be enjoined. Sears, Roebuck & Co. v. Federal Trade Commission (C. C. A. 7), 258 F. 307; Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729, supra; Royal Baking Powder Co. v. Federal Trade Commission (C. C. A. 2), 281 F. 744; Guarantee Veterinary Co. v. Federal Trade Commission (C. C. A. 2), 285 F. 853; Fox Film Corporation v. Federal Trade Commission (C. C. A. 2), 296 F. 353; Proctor & Gamble Co. v. Federal Trade Commission (C. C. A. 6), 11 F.(2d) 47; Federal Trade Commission v. Balme (C. C. A. 2), 23 F.(2d) 615; Indiana Quartered Oak Co. v. Federal Trade Commission (C. C. A. 2), 26 F.(2d) 340.

The potential deceptive character of this trade-name is also shown by its similarity with "Duro," the registered trade-name of A. C. Lawrence Leather Company, used in connection with its advertisements and sales of calfskin and veals—genuine leathers—manufactured by it for use in upholstering and in making traveling bags and other leather goods, and in which branch of trade petitioners and Lawrence Company compete.

While "Duro" is not combined with the word "leather" in a compound word, as is petitioners' "Dura," its use is associated with leather. If "Duraleather" was the name given to a genuine leather, there would be no question but that it would be in conflict with the registered name "Duro" used as aforesaid whenever and wherever the two competed.

True, the manufacturers of goods made from either of these products, and the jobbers who sell them to such manufacturers, are not deceived as to the character of the "Duraleather." To them the product thus named is but a substitute for the genuine article, some of which is called "Duro," but not so to the ordinary ultimate buyers of the goods made from this imitation product, who know of goods being made of leather called "Duro." To them, not having the knowledge of the original or intermediary buyers, goods advertised as made from "Duraleather" would be likely to mean that they were made from the "Duro" product—genuine leather.

Goods bought under such conditions would tend to injure and victimize both purchasers and Lawrence Company. That the record does not show any instances of the latter kind of purchasers does not militate against the Commission's finding that the petitioners' trade-name has the capacity and

738

tendency to deceive the ultimate buyer. **For** under the cited cases, actual deception is not necessary to be shown ere such unfair trade practices can be enjoined.

For the foregoing reasons we are of the opinion that petitioners' trade-name is "Duraleather"; that it is inherently false; and that it has the capacity and tendency to deceive the ultimate purchasers of the goods made from the imitation leather marked, advertised, and marketed under such trade-name into the belief that such goods are made of genuine leather.

The remaining question is:

*Shall the challenged order be affirmed or modified?*

The record before us is barren of any evidence indicating that in the selection or use of this trade-name, petitioners sought to deceive the purchasers of the goods made from the product bearing that name, or to overreach any of their competitors by unfair commercial methods.

During a decade and a half of trading, Masland Company and its predecessors in business built up a trade closely associated with this name which, during that period, has become increasingly of trade value to petitioners. The relinquishment of this name, now made imperative, necessarily will be attended with some loss, which should not be greater than necessary to fulfill the Commission's order. We therefore modify the order by adding to the last paragraph the following: "That if the manner and form of their compliance should embrace a new and acceptable trade-name, the petitioners may for six months after the Commission has approved the new manner and form, use on this imitation leather product, stationery, and in their advertising the word 'Duraleather' in representing that the new trade-name stands for the same product which the Masland Company had previously manufactured and petitioners had previously sold under the name 'Duraleather.'"

Thus modified, the order of the Commission is affirmed.