## C. HOWARD HUNT PEN CO. v. FEDERAL TRADE COMMISSION.

No. 10479.

United States Court of Appeals,
Third Circuit.

Argued Nov. 19, 1951.

Decided May 27, 1952.

Hastie, Circuit Judge, dissented in part.

---

Harvey Lechner, Philadelphia, Pa. (Synnestvedt & Lechner, Philadelphia, Pa., Alfred C. Aurich, Philadelphia, Pa., on the brief), for petitioner.

J. B. Truly, Washington, D. C. (W. T. Kelley, Gen. Counsel, James W. Cassedy, Asst. Gen. Counsel, Washington, D. C., on the brief), for Federal Trade Commission.

Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Petitioner, a pen point manufacturer, seeks to set aside an order of the Federal Trade Commission of March 29, 1951 which ordered it forthwith to cease and desist from:

"(1) Representing, through the use on fountain pen points of the term '14 Kt. Gold Plated' or '14 K. Gold Plate,' or any other term or mark, that such points are coated or covered with an alloy of substantial thickness and not less than 14/24ths by weight of gold, when such is not the fact; or misrepresenting in any manner the quantity or quality of the gold coating or covering on any fountain pen points.

"(2) Representing in any manner, directly or by implication, that fountain pen points are made of an alloy of gold when such points are in fact made of other materials and are merely coated or covered with an alloy of gold.

"(3) Using the word 'Iridium' or the words 'Iridium Tipped,' or any simulation thereof, either alone or in conjunction with other words, to designate, describe or refer to any fountain pen points which are not in fact tipped with the element iridium.

"(4) Using the word 'Waltham' as an imprint on or in connection with the sale of any fountain pen points; or otherwise representing that any of the respondent's fountain pen points are the products of the Waltham Watch Manufacturing Company of Waltham, Massachusetts."

For many years the petitioner, a New Jersey corporation, has been making inexpensive fountain pen points at its Camden, New Jersey, plant and is one of the largest of such manufacturers. Its products are made of stainless steel which are then electroplated with a coating of gold alloy. Concededly these have been and are sold and shipped by it to manufacturers and assemblers of fountain pens all over the United States and in export trade.

## Section 1

Petitioner has no objection to the form of Section 1 of the above order but asserts there is no basis for the section because, according to it, for some four years prior to the filing of the complaint in February, 1943, it has only done that which is plainly permissible under the section. The Commission rejected petitioner's assertion and found that petitioner "has continued to represent that its pen points are 14 karat gold plated when in fact they are coated with such a thin covering of such a minute quantity of gold alloy as to not constitute 14 karat gold plate as that term is understood by the purchasing public". The foundation of this statement and of Section 1 of the order is that the representation "14 Kt. Gold Plated" or "14 K. Gold Plate" means that as said in Section 1, "* * * such points are coated or covered with an alloy of substantial thickness and not less than 14/24ths by weight of gold,". That is a single complete representation. For a pen point to be properly designated as "14 K.

Gold Plate" it must be covered with not less than 14 karat gold alloy of substantial thickness. If either the requisite fineness or thickness is missing it is not entitled to such description. Nor would it be, of course, though not vital in the present circumstances if both fineness and thickness were absent. The only question for our review of Section 1 is whether on the record as a whole there is substantial evidence in support of the finding of that section.

The findings of the Commission are set out below which deal generally with the necessity of a substantial thickness of gold plating of a fineness of not less than 14 karat on fountain pen points so marked.[1] As to certain of petitioner's pen points it was found that they had stamped on them representations as to their composition and quality. Among and typical of the representations were and are the following: "14 Kt Gold Plated" and "14 K Gold Plate". The Commission then found:

"The use by respondent of the inscriptions '14 Kt Gold Plated' and '14 K Gold Plate' and others of similar import and meaning not set out herein, has the tendency and capacity to deceive and mislead the purchasing public into the belief that said fountain pen points so marked are plated with a substantial amount of 14 karat gold alloy of substantial thickness. In truth and in fact, respondent's fountain pen points so marked are not plated with a substantial amount of gold alloy and the plating on the said points is not of a substantial thickness. Its said points so marked are coated with a gold alloy of a thickness of less than seven millionths (.000007) of an inch. Certain of said points manufactured by respondent prior to 1938 were test-

ed by the National Bureau of Standards and were found to be coated with a gold alloy of a thickness of from approximately 3.6 millionths (.0000036) to less than two millionths (.000002) of an inch, which gold alloy had a value of approximately five cents per gross of pen points. The coating of gold alloy on the pen points so tested consisted of such a minute quantity that its actual karat fineness could not be determined. There is no evidence that respondent's methods of gold plating their pen points have varied from the time of manufacture of the pen points so tested."

It is true that the pen points of petitioner marked "14 Kt Gold Plated" or "14 K Gold Plate" which were examined by the Bureau of Standards were from the period prior to 1939. Apparently they were manufactured in 1937. The testimony of the president of petitioner shows that it had continued with at least one of its objectionable imprints to sometime in September 1938. That type of imprint not only specified the fineness of the gold alloy used in covering the pen point but by its legend that the point was "Gold Plate" or "Gold Plated" it affirmatively indicated that the gold alloy covering because of the amount of the gold alloy present on the pen point was entitled to be labeled "Gold Plate" or "Gold Plated". Petitioner's claim that at least since April, 1939 (when its consultant, Davidoff, hereinafter mentioned, began his association with the firm) it has " * * * consistently stamped the term '14 Kt. Gold Plated' or '14 K. Gold Plate' only on pen points which are covered with an alloy of 'substantial thickness and not less than 14/24ths by weight of gold' * * *" implies a willingness to concede that prior to April, 1939

1. Fourteen karat is a standard of fineness representing that an object so marked consists of an alloy which contains 14/24ths pure gold by weight. Gold plating of 14 karat fineness is the lowest karat fineness of gold which will successfully resist the corrosive effects of ink. A substantial thickness of gold plating of a fineness of not less than 14 karat is necessary to protect fountain pen points from such

corrosion. One of the purposes of gold plating fountain pen points is to protect them from such corrosion. Fountain pen points which are covered with a substantial thickness of gold plating of a fineness of not less than 14 karat have great appeal to the consuming public because of the appearance, intrinsic value and known resistance to corrosion of the gold.

its pen points so marked were not plated with a substantial thickness of not less than 14 karat gold alloy. As to those pen points tested by the Bureau of Standards there is substantial evidence in the record that they had thin coatings of gold running from 1.4 to 3.6 millionths of an inch. They did not have even sufficient gold coating from which their karat fineness could be determined by the usual tests.

It is not seriously disputed that the representations "14 Kt Gold Plated" or "14 K Gold Plate" mean to the purchasing public that pen points so marked are cov-ered with a substantial thickness of gold alloy of not less than 14 karat fineness. One Government expert testified to a trade practice standard that the gold must be from a minimum of seven millionths of an inch thick before they can call it gold electroplate. The question of what would constitute a substantial thickness of gold alloy in gold plating is not before this court for the reason that the petitioner contends that the testimony of its witness, Davidoff, a consulting chemical engineer, shows that since April, 1939 the thickness of its pen point coating has been from substantially six to seven millionths of an inch. Thus instead of affirmatively attacking a standard of substantial thickness, petitioner asserts that it has met that standard consist-ently since 1939.

Davidoff, testifying on April 11, 1949, said that he had been engaged as a consultant for chemical and metallurgical processes for approximately twelve years. He said that he had been employed as a consultant by petitioner for approximately ten years; that he had spent quite a bit of time in the plant; spent many days there training the plating foreman and had standardized methods of plating. He stated that he still goes up to the plant quite often and does a considerable volume of laboratory work on petitioner's problems relating to the plating field and corrosion. He said that the six to seven millionths of an inch gold plating on the pen points amounted to a tenth of a cent of gold per nib and fifteen cents worth on each gross of nibs. He said that this standard had been in effect prior to his association with the Hunt company and that " * * we have maintained it since that time." There is no credible proof in the case on behalf of petitioner or otherwise that petitioner had changed from its objectionable method of using a thin gold coat during the period from September, 1938 to April, 1939 when Davidoff came in as consultant. The Commission could hardly be expected to accept Davidoff's statement as to what went on prior to his association with the company. Regarding the actual presence of from six to seven millionths of an inch of gold on petitioner's pen points, Davidoff does not establish this by any accurate scientific test such as those used by the Bureau of Standards when it had examined petitioner's pen points and had found them insubstantially coated. He readily disposes of the whole problem by saying that it is a question of mathematics. "We have the area and the weight of gold, and the density of gold, and there is just a simple relationship which relates to all of those factors." Davidoff was petitioner's sole witness as to it increasing the quantity of gold in its plating operation. His mathematical calculation was based on the assumption that fifteen cents worth of gold on each gross of nibs would be spread equally over all of the nibs. In fact the record shows that where pen points are electroplated in the manner used by petitioner, with about 10,000 pen points plated simultaneously, the thickness of gold varies from place to place on a given pen point and also varies from pen point to pen point. What makes Davidoff's mathematical calculation additionally suspect is the testimony of petitioner's president that the actual value of gold on a standard size gross of nibs is around twelve cents. Even if that amount of gold could be spread equally over a gross of nibs, it could never result in a substantial thickness of seven millionths of an inch.

The president of petitioner was shown two separate Commission exhibits consisting of six pen points each. The first group was stamped "Duripoint 14 Kt. Gold Plate" and the second six were stamped "Warranted Durium Tipped 14 Kt. Gold Plate." The pens in both these exhibits were in-

substantially gold coated. The witness stated that as to the first group, "* * * this particular imprint according to our records was discontinued in September 1938." He said regarding the second exhibit, "The marking reading 'Warranted Durium Tipped' etc., was discontinued in 1938." It is the fact that nowhere did the witness testify that the manufacture of such points with their objectionably thin gold coating was itself so discontinued.

█ From all of the foregoing, we think there was substantial evidence on the record as a whole to justify the Commission's finding that petitioner has continued to represent that its pen points are 14 karat gold plated when in fact they are covered with such a minute quantity of gold alloy as not to constitute 14 karat gold plate as that term is understood by the purchasing public. Universal Camera Corporation v. National Labor Relations Board, 340 U. S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Our job is not to retry this case. We have no right to substitute a different view from that of the Commission so long as we have determined that its findings have substantial support in the whole record. See the Federal Trade Commission Act, 15 U.S. C.A. § 45(c), which, in providing for judicial review of a cease and desist order of the Commission, directs that "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive."

As we have seen there is strong evidence that the gold alloy in the examined pen points was not of the thickness which would warrant the use of the term "Gold Plate". This of itself justifies Section 1 of the order. While there may be some inference that the asserted fineness of the alloy was also lacking, that point is not essential to the upholding of Section 1 and need not be discussed further. The action of the Commission as set out in Section 1 of the order is appropriate under the existent circumstances. We do not reach the question whether the Commission would have abused its discretion in entering this section of the order had the petitioner in fact, as alleged, discontinued the unlawful practice four years before the filing of the complaint.

### Section 2

The factual basis for this section of the order is transparently clear from the Commission's findings of facts. There it said:

"Paragraph Five: In the course and conduct of the aforesaid business for several years prior to 1939, respondent stamped on certain of its pen points the inscription '14 K' or '14 Kt' in large type and underneath stamped the inscription 'Gold Plate' or 'Gold Plated' in type so small as to be inconspicuous and almost illegible. On certain of these pen points the inscriptions 'Gold Plate' or 'Gold Plated' were stamped so far down the shank of the pen point as to be hidden from view when the point was properly fixed in the barrel of the fountain pen. *The use by respondent of such inscriptions in this manner has had the tendency and capacity to deceive and mislead the purchasing public into the belief that said fountain pen points so marked were made of an alloy of gold. In truth and in fact such pen points were made of other materials coated with an alloy of gold.*

"On July 31, 1939, respondent entered into an agreement with the Commission to cease and desist from continuing to mark its fountain pen points in any manner having the capacity or tendency to cause the belief that the pen points are of 14 karat solid gold when such is not the fact. Since that agreement, on all pen points manufactured by respondent marked with the inscription '14 K Gold Plate' or '14 Kt Gold Plated,' the said numerals and letters thereon have been of the same size, and the words 'Gold Plate' or 'Gold Plated' have been placed sufficiently far from the base of the pen point as to always be clearly visible when the point so marked was assembled in the completed fountain pen.

* * * * * *

"Paragraph Seven: * * *

"By placing in the hands of manufacturers and assemblers of fountain pens its fountain pen points stamped:

and inscribed as aforesaid, respondent has furnished said manufacturers and assemblers with the means of deceiving the public into the belief that certain of the said fountain pen points were made of genuine 14 karat gold, * * *." (Emphasis supplied).

The petitioner contended before the Commission that, inasmuch as it entered into a stipulation with the Commission prior to the issuance of the complaint in this matter wherein it agreed to cease and desist from representing that its pen points are of solid gold, and inasmuch as it has complied with that agreement, no order to cease and desist should be entered by the Commission as to such representation. In answer to that, the Commission explained the legal basis for Section 2:

"The Commission has found that respondent has continued to represent that its pen points are 14 karat gold plated when in fact they are coated with such a thin covering of such a minute quantity of gold alloy as to not constitute 14 karat gold plate as that term is understood by the purchasing public. In the view of the Commission the respondent's false representation that its pen points are plated with 14 karat gold and its prior false representation that the pen points are made of 14 karat gold are so similar as to create a doubt as to whether the respondent may not in the future resume the practice of falsely representing that its pen points are made of 14 karat gold. The Commission therefore finds that an order requiring respondent to cease and desist from falsely representing that its pen points are made of an alloy of gold is in the interest of the public."

In this court petitioner has adopted a construction of Section 2 of the order which totally ignores its factual and legal basis as above detailed by the Commission. We think the Commission was entirely reasonable in its finding that an order framed in the language of Section 2 is in the interest of the public. Petitioner's arguments studiously avoid any quarrel with the order to the extent that it prohibits the resumption of petitioner's former practice

of falsely representing that its pen points are made of 14 karat gold.

Petitioner's major premise, from which flows all of its objections to this section of the order, is that Section 2 deals with unmarked pen points, petitioner having decided that Section 1 deals with pen points which are marked. Typical of the arguments which are raised against this section, which are entirely without substance, is the one that the section would be violated if petitioner made and marketed an unmarked pen point made of stainless steel or other base metal which is coated or covered with gold "because such an unmarked article would superficially look like gold and therefore petitioner might be regarded as implying, from the very color of the finished product, that it was made of gold alloy." That there is no merit to this contention is fully demonstrated by the Commission's express finding that "The evidence of record is not sufficient to sustain the allegations of the complaint * * * that the public * * * is likely to be misled or deceived, by the golden color of respondent's pen points, into falsely believing that such points are either made of gold alloy or are gold plated." Again petitioner says that the word "merely" is most indefinite and that it may have reference to a "* * * coating of gold so thin that a pen point is not corrosion resistant." It is plain that Section 2 is not concerned at all with the thickness of the coating of gold alloy on petitioner's pen points. Section 1 of the order governs that subject. Section 2 prohibits the resumption of petitioner's former practice of falsely representing that its pen points are made of 14 karat gold, and that alone. The section is not too broadly worded for its purpose and we do not think it fairly susceptible of petitioner's attempted construction of it.

### Section 3

The complaint alleged that petitioner's use of the words "Iridium tipped" stamped on certain of its pen points constitutes a representation that said pen points are tipped with a comparatively rare and expensive element known as iridium and that none of petitioner's pen points are actually

so tipped. The answer admitted that petitioner had used and was continuing to use the words "Iridium tipped" on its pen points, although in fact its points were not tipped with iridum. Its sole defense, affirmatively stated, was that the words "Iridium" or "Iridium tipped" when used in connection with pen points " * * * have acquired, by common acceptation for many decades, a secondary meaning, to wit, that the pen points are tipped with metal of unusual hardness and wearing quality."

■ A high degree of proof was essential in establishing the defense of secondary meaning before the Commission. The very wording of petitioner's answer recognizes that, in the words of Mr. Justice Cardozo, it had to show that " * * * by common acceptation the description, once misused, has acquired a secondary meaning as firmly anchored as the first one." Federal Trade Commission v. Algoma Co., 291 U.S. 67, 80, 54 S.Ct. 315, 320, 78 L.Ed. 655. It could not prevail if its evidence was of a quality " * * * short of establishing two meanings with equal titles to legitimacy by force of common acceptation." Ibid. We think that petitioner failed to establish the fact of secondary meaning under those governing principles. Certainly the Commission was justified, Universal Camera Corp. v. National Labor Relations Board, supra, 340 U.S. at page 490, 71 S.Ct. at page 460, in finding, as it did, that " * * * this contention is not supported by the record and that respondent's use of these terms to designate and describe its products is erroneous and misleading."

■■ From the very defense of secondary meaning, the Commission was free to recognize that the word "iridium" has a primary meaning, i.e., an unusually hard element of the platinum family.[2] Petitioner's argument before the Commission had no starting point without that concession. Indeed the word speaks for itself. Perloff v. Federal Trade Commission, 3 Cir., 150 F.2d 757, 758. Thus the use of the word "iridium" or its equivalent on petitioner's pen points, absent the secondary meaning contended for it by petitioner, was and is inherently false and misleading to the public and for that reason has the tendency and capacity to mislead the purchasing public into the belief that petitioner's pen points are tipped with iridium, when that is not the fact. It is of no moment, in this proceeding in the public interest, that what the purchaser gets in the tipping material used on petitioner's pen points may be as serviceable as or almost as serviceable as iridium. "The consumer is prejudiced if upon giving an order for one thing, he is supplied with something else. * * * In such matters, the public is entitled to get what it chooses, though the choice may be dictated by caprice or by fashion or perhaps by ignorance." Federal Trade Commission v. Algoma Co., supra, 291 U.S. at page 78, 54 S.Ct. at page 320. There is prejudice also to other manufacturers of pen points who, as this record shows, purchase the same tipping material as does petitioner but who do not mark their points with the word "iridium."

At most petitioner's testimony with respect to secondary meaning is that in the pen trade, since 1920 or 1921, manufacturers and distributors of pen points have come to understand that points marked "iridium" are not in fact tipped with that element but are tipped with a synthetic alloy containing no iridium.[3] Petitioner uses that alloy in two forms, Alloy No. 425 which sells for about $85 an ounce and Alloy No. 514, about $80 an ounce. At the time of the Commission hearing, the testimony was that iridium sold for $165 an ounce.

2. Iridium is defined in Funk & Wagnalls' New Standard Dictionary (1944) as follows: "A silver-white, hard, brittle metallic element belonging to the platinum group, with the members of which it is found alloyed in nature."

3. It is interesting to note that one of petitioner's witnesses, Julius M. Kahn, treasurer and assistant general manager of David Kahn, Inc., understood that a very small percentage of iridium was actually present in the synthetic alloy. His firm is reportedly the largest producer of fountain pens in the world.

The president of petitioner admitted that the material used for tipping its pen points is invoiced to it by the seller, American Platinum Works, as "pen tipping material" and not as "iridium". "They invoice it as their number so-and-so, and I have knowledge as to the analysis of the particular alloy invoiced." The manager of the American Platinum Works testified that his company did not call the tipping material "iridium". They refer to it merely as "tipping material". The only time their product was ever called "iridium" was once " * * * by mistake by a typist. She billed it once as 'iridium'." He clearly disposed of any thought that it was a proper practice to call his tipping material "iridium" when, testifying about a competing product, he said: "I know that one of our competitors, he put a small percentage of iridium in it, say, about two per cent—I am not sure myself—just that he could call it 'iridium.' *Now, we didn't want to camouflage anything, we didn't put any in.*" (Emphasis supplied).

Petitioner principally relies on the testimony of witnesses who were largely interested in perpetuating the practice of labeling this tipping material "iridium". In addition to its president, executives of at least three of the chief manufacturers of inexpensive pen points testified on its behalf. All of the latter followed the identical practice of marking their pen points "Iridium tipped" though they used the same tipping materials as does the petitioner. It may be that their testimony was sufficient to establish that in the pen trade, among manufacturers and distributors of pen points, the word "iridium" has in fact come to have a secondary meaning. But their knowledge is not to be imputed to the public[4] and we cannot say that as to the public petitioner has proved to the requisite degree of certainty the secondary meaning for which it contended.

### Section 4

Petitioner's sole objection to this section is that its former practice of manufacturing pen points inscribed with the word "Waltham", was discontinued in 1941, two years before the Commission's complaint was filed in this proceeding. Petitioner alleged in its answer to the complaint that it has no intention of resuming that practice but there is no specific testimony to that effect. We see no reason why even if there had been the Commission would have been bound simply by the promise of the petitioner. Particularly is this true where petitioner's claim before the Commission and before this court has been that it was not guilty of any deception in so marking its pen points because it was acting on instructions from its customer. Such a claim is patently without merit and was so for many years before 1941. One who places in the hands of another a means of consummating a fraud or competing unfairly in violation of the Federal Trade Commission Act is himself guilty of a violation of the Act. Federal Trade Commission v. Winsted Hosiery Co., 1922, 258 U.S. 483, 494, 42 S.Ct. 384, 66 L.Ed. 729. The Federal Trade Commission Act, 15 U.S.C.A. § 45(b), gives the Commission the right to file a complaint whenever any person, etc. " * * * *has been* or is using any unfair method of competition * * *." (Emphasis supplied). Petitioner may not be heard to complain of an order restraining it from an unfair method of competition when at the same time petitioner insists it has the right to practice it. Galter v. Federal Trade Commission, 7 Cir., 186 F.2d 810, 813.

A decree will be entered affirming the order of the Federal Trade Commission and commanding obedience to its terms.

HASTIE, Circuit Judge (dissenting in part).

In this case judicial approval is being accorded a 1951 order of the Federal Trade Commission—after hearings begun in 1943 and completed in 1949 on a 1943 complaint —which in the main directs the Hunt Pen Company to cease and desist from manufacturing practices not shown to have been indulged since the 1930's. Apposite, there-

---

4. Masland Duraleather Co. v. Federal Trade Commission, 3 Cir., 34 F.2d 733, 737; Indiana Quartered Oak Co. v. Federal Trade Commission, 2 Cir., 26 F.2d 340, 342, certiorari denied 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544.

fore, is the recent remonstrance of a member of the Commission that the agency had "tackled * * * [a] problem at the tomb, instead of the womb". See Grocery Distributors Association, 1948, 44 F.T.C. 1200, 1217. Similar concern about untimeliness negativing public interest underlies my unwillingness to lend judicial sanction to three of the four provisions of the Commission's present order which to me seem merely obituary denunciations rather than curative interventions. But since this conception of what is funereal and futile must also embrace the dissenting postscript in which it is expressed, my views will be stated in very brief summary.

The first paragraph of the Commission's order directs the manufacturer to cease and desist from representing that its pen points are covered with gold of fourteen carat fineness and substantial thickness. The record contains sworn testimony for the manufacturer that ever since 1939 its pens have been so coated and that its representations of that fact have been accurate and proper. The entire case to the contrary offered by the government, which bore the burden of proof, was that analysis of some pen points manufactured by the respondent before 1939 and stamped "14KT, gold plate" revealed only an inconsequential and scarcely measurable gold wash or coating. There is no evidence that the government had examined or tested a single pen point manufactured by the respondent after 1938. In these circumstances, I think there was not substantial evidence on the whole record that the offending practice had been continued beyond 1938. It seems to be conceded that the pre-1939 practices, unless continued thereafter, afford insufficient justification for this paragraph of the Commission's order.

The second paragraph of the order prohibits representations that pen points are 14 carat gold, as distinguished from gold plated base metal. The government concedes that objectional practice in this regard was discontinued pursuant to stipulation of the manufacturer more than three years before the present complaint was filed. The sole justification for its proscription now is the similarity of this long since discontinued practice to the allegedly more recent practice involved in paragraph one of the order. But it has already been shown that there is no evidence that the misrepresentation charged in paragraph one was continued after 1938.

I agree with the court that the third paragraph of the order should be sustained and enforced.

The fourth paragraph prohibits the use of the word "Waltham" on pen points. It is not disputed that the imprint "Waltham" was placed on certain pen points formerly manufactured by Hunt Pen Company for and pursuant to the specifications of a particular customer who was marketing fountain pens under that name which he had registered as a trademark. It is to be remembered that Hunt does not manufacture complete pens but rather manufactures pen points for sale to those who assemble and distribute fountain pens under whatever name. There is no indication that the Waltham imprint ever was used except at a particular customer's specification or that it has been used at all since 1941. Indeed, the customer in question long since stipulated with the Commission that it would no longer market under the imprint "Waltham" and there is no suggestion that it or anyone else is likely to do so improperly. There is no indication that Hunt intended or suspected anything deceptive when it complied with the customer's request to mark his pens with the name he had registered. The Commission suggests only one basis for possible apprehension Hunt might at some time wrongfully imprint "Waltham" on pen points. The Commission points out that, although the company says that it does not and will not use this imprint, it at the same time claims that it acted innocently ten years ago when it filled a customer's order for pen points with that imprint. On this basis alone the Commission reasons that if the supplier does not confess turpitude and willful wrong, although it believes, as the evidence indicates, that it was at worst the innocent instrumentality of another's wrong, there is danger that it may do willful wrong in the future. But, *non sequitur*.

I would give the Commission great lee-way in deciding when there is danger that a deceptive act may be repeated. But there should be something in the record to show this danger when it is the sole basis of public interest in discontinued practices. When the proscribed practice has been discontinued years before complaint and the Commission's apprehension of renewal seems clearly without foundation, I think a court should not accept the judgment of the Commission or enforce its order. Cf., Winston Co. v. F.T.C., 3 Cir. 1925, 3 F.2d 961, certiorari denied, 269 U.S. 555, 46 S.Ct. 19, 70 L.Ed. 409; F.T.C. v. Civil Service Training Bureau, 6 Cir. 1935, 79 F.2d 113. But cf., Educators Ass'n v. F.T.C., 2 Cir. 1940, 108 F.2d 470, 473, rehearing denied, 2 Cir., 110 F.2d 72, modified, 2 Cir., 118 F.2d 562; F.T.C. v. A. McLean & Son, 7 Cir. 1936, 84 F.2d 910, 912–13, certiorari denied, 299 U.S. 590, 57 S.Ct. 117, 81 L.Ed. 435. We have such a case here.