234 F.2d 335
 NORTHERN FEATHER WORKS, Inc., Petitioner,
v.
FEDERAL TRADE COMMISSION, Respondent.
Bernard H. SUMERGRADE, Harry O. Sumergrade and Saul R.
Sumergrade, co-partners trading as N. Sumergrade &
Sons, Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 Nos. 11727, 11728.
 United States Court of Appeals Third Circuit.
 Argued May 7, 1956.
Decided June 5, 1956.
 
 John C. Prizer, New York City (Thacher, Proffitt, Prizer, Crawley, & Wood, New York City, on the brief), Howard B. Nichols, New York City, for Northern Feather Works, Inc.
 Paul E. Doherty, Jersey City, N.J. (Lowenstein, Pitcher, Amann & Parr, New York City, on the brief), for Bernard H. Sumergrade et al.
 James B. Truly, Washington, D.C. (Earl W. Kintner, Gen. Counsel, Robert B. Dawkins, Asst. Gen. Counsel, Joseph B. Kennedy, Jr., Washington, D.C., on the brief), for Federal Trade Commission.
 Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.
 GOODRICH, Circuit Judge.
 
 
 1
 This is a petition to set aside an order of the Federal Trade Commission issued under section 5 of the Federal Trade Commission Act. 15 U.S.C.A. 45.
 
 
 2
 Paragraph (c) of the statute gives the test of the scope of our review. 'The findings of the Commission as to the facts, if supported by evidence, shall be conclusive. * * *' See C. Howard Hunt Pen Co. v. Federal Trade Commission, 3 Cir., 1952, 197 F.2d 273, 278. The Federal Trade Commission had a series of hearings involving the labeling of feather pillows by all or nearly all the concerns engaged in that industry. The Commission has issued a series of cease and desist orders. Two of the cases involved are presented in this Circuit and submitted for decision here. Others, we are advised, are pending in other circuits. But, so far as we are informed or can find out, no decision has yet been reached.
 
 
 3
 In general the question involved in these two cases has to do with what is alleged to be inaccurate and misleading labeling of the contents of pillows manufactured by the two concerns who are protesting here. The record takes us through the process as well as the trials and tribulations of the feather pillow industry. The hearing was pretty much a battle between experts in the sense that both the Commission and the manufacturers offered expert testimony from persons about whose integrity no deprecatory suggestion is made. The Commission's expert was J. Davis Donovan, Chief, Division of Bedding and Upholstery, Department of Health, State of Maryland. This witness has been employed since 1916 by the State of Maryland and has been Chief of the division mentioned since 1924. He is widely acquainted with the manufacturing processes used in the industry, has conducted tests without number with regard to it and has a trained staff which works under his direction.
 
 
 4
 The petitioners' expert was Mr. Ernest Anderson, employed by the United States Testing Company since 1948. Mr. Anderson received a degree in chemistry from Seton Hall in 1953. His staff consists of 'one young lady' and his experience in testing the contents of a mass of feathers is much less than that of Mr. Donovan. His employer is more largely engaged in other types of testing than the one with which we are concerned here.
 
 
 5
 The Commission accepted and relied upon Mr. Donovan's testimony. Northern suggests that the Commission should have accepted Mr. Anderson's results which were much more favorable to them and rejected those of Mr. Donovan.[1] We should not have done so had we been the Commission but the responsibility for accepting the testimony of one qualified expert and rejecting the other is emphatically not a problem for a Court of Appeals. Neither side has made the slightest imputation of lack of integrity on the part of the experts. It is simply a case of the trier of the fact having accepted the accuracy of the expert whose experience with this kind of testing runs back nearly thirty years.
 
 
 6
 With the reasonableness of acceptance of Mr. Donovan's analysis and explanations established, there really is not very much to the petitioners' case. Northern, for instance, complains that the method chosen by the Donovan staff for getting samples was not as good as that chosen by its expert. Northern says that the accurate way to get a test of the down content of a pillow is to cut three slits on three different sides and take the samples out. The Donovan way is to cut one slit through which the operator may reach into three different portions of the pillow and pull out a sample. The Donovan testimony was that this has been the method employed for thirty years by him and it produces accurate results. The differences, if any, in accuracy between one slit and three are surely not a subject for judicial review.
 
 
 7
 The most serious argument made by the petitioners in this case is that compliance with the Commission's order is impossible and that the petitioners are in danger of being hauled into court and punished for contempt for a failure against which precautions cannot be taken. This point, if it can be maintained, is indeed a serious one. But when the testimony scattered through three appendices is examined, the difficulties appear not so great as argument makes them.[2]
 
 
 8
 It is agreed by everyone concerned in the case that a completely accurate statement of the contents of feather pillows cannot be made. The reason is that stocks which the manufacturers buy vary greatly and that in the process of filling pillows the proportions of the various types of feathers or down vary somewhat from one pillow to another. The rules of the Commission with regard to this merchandise recognize that fact. There was an earlier rule or practice in the industry which allowed a tolerance of ten per cent from stated contents. 16 C.F.R. § 78.4, § 78.5 (1949). This proved, from the industry point of view, not to be a sufficient tolerance. In 1949 and 1950 there was a joint conference of the matter participated in by representatives of the Commission and the feather pillow industry. As a result a trade practice rule was drawn which permitted a tolerance of fifteen per cent. 16 C.F.R. § 200.3(c)(1) (Supp. 1956). By this is meant, for instance, that if a pillow is labeled '100% down' and consists of 85% down it will not be treated as mislabeled. Can the industry comply with a rule requiring accuracy up to 85%? Mr. Donovan testified that it could.
 
 
 9
 We think that the testimony which was before the Commission helps understand what has been going on in the industry. It was testified that the main factor in buying by retail dealers is price. The competition in the industry is very keen among the manufacturers. One witness said if there was '1000% enforcement, and if we were all forced to put on a pillow that this contains a minimum of such and such, sure that would be right. * * *' Another industry witness gave a categorical negative answer to the following question: '* * * you mean that if a manufacturer is trying to make a down pillow and have it contain as much natural down as possible, can be compete with one who is shooting at the 85% down factor?'
 
 
 10
 To put the matter in our own words, there was evidence from which the Commission could find that the 15% tolerance allowance is sufficient for those who are trying in good faith to make the labels say accurately what the content of the pillow is. Those who are trying to make the product get just over the mark allowed for tolerance may well find themselves falling below it because of the impossibility of determining pillow content with complete accuracy. We conclude, therefore, that the argument that the Commission is requiring the impossible is not well founded.
 
 
 11
 The suggestion is also made to us that public interest does not demand an order requiring accurate labeling. A quotation from a recent Supreme Court opinion gives one complete answer to this suggestion. Speaking for the Supreme Court, Mr. Justice Minton says in American Airlines, Inc., v. North American Airlines, Inc., 1956, 76 S.Ct. 600, 604:
 
 
 12
 'It should be noted at the outset that a finding as to the 'interest of the public' under both § 411 (49 U.S.C.A. § 491) and § 5 is not a prerequisite to the issuance of a cease and desist order as such. Rather, consideration of the public interest is made a condition upon the assumption of jurisdiction by the agency to investigate trade practices and methods of competition and determine whether or not they are unfair. * * *'
 
 
 13
 Added to this quotation is the testimony in the case. There was testimony, which the Commission could well accept, that consumer purchasers of pillows make their purchases on the basis of first, a physical inspection of the pillow for size, weight and so on and, second, an inspection of the label. We do not see that the question whether labels offered to the public should be accurate is one on which very much negative argument can be made.
 
 
 14
 Attacks were made on the sampling methods employed by the Commission's expert. Northern, for instance, opines that samples from two pillows are not enough and makes much of Mr. Donovan's statement that the more samples you have the better your test is. Of course this is in a measure true and the generalization holds for thousands of other types of tests than that of pillows. We think all that is required here is a reasonable basis for making a generalization. The trade practice rules say that not less than two samples should be taken. 16 C.F.R. § 200.3(c)(2)(iv) (Supp.1956). Mr. Donovan testified that in his own practice two were sufficient. (It has already been shown out of two pillows three samples were taken from each.) These trade practice rules were not taken as legal commands by the hearing examiner, the Commission or ourselves. But we think that a set of rules worked out in conference between a government agency and an industry can be taken as a guide if, to those responsible for enforcement, they are reasonable and fair. That is what was done here.
 
 
 15
 One petitioner makes the point that the Commission did not prove that anybody was actually deceived by the inaccurate labels. That is not necessary. Pep Boys-- Manny, Moe & Jack v. Federal Trade Commission, 3 Cir., 1941, 122 F.2d 158, 161; Perloff v. Federal Trade Commission, 3 Cir., 1945, 150 F.2d 757, 759.
 
 
 16
 The petition to set aside the order will be denied and an order of enforcement as provided by the statute will be entered by this Court.
 
 
 
 [1]
 The petitioners in the Sumergrade case do not contest the validity of the Commission's finding that their pillows in evidence were falsely labeled
 
 
 [2]
 This would have been a perfect case for a joint appendix prepared in accordance with our rule 24(6) which would give a continuity to the testimony that three separate submissions do not