## CHAS. A. BREWER & SONS v. FEDERAL TRADE COMMISSION.
### No. 9993.

Circuit Court of Appeals, Sixth Circuit.
Dec. 5, 1946.

Theodore E. Rein and Herldon H. Bowen, both of Chicago, Ill., for petitioners.

Donovan Divet, of Washington, D. C. (W. T. Kelley, Walter B. Wooden, and Donovan Divet, all of Washington, D. C., on the brief), for respondent.

Before MARTIN, McALLISTER, and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

The petitioners for review invoke the jurisdiction of this court to set aside the findings and conclusions of the Federal Trade Commission and to vacate its cease and desist order, which was entered after a hearing on the complaint of the Commission, the answer of respondent petitioners, abundant testimony and other evidence taken before a trial examiner; and upon that offi-

cial's report, the exceptions thereto, and the briefs of the respective parties.

The challenged order directed that the petitioners cease and desist from "selling or distributing in commerce, as 'commerce' is defined in the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., punch boards, push cards or other lottery devices which are to be used or may be used in the sale or distribution of merchandise to the public by means of a game of chance, gift enterprise, or lottery scheme."

From the findings of fact of the Federal Trade Commission, it appears that petitioners, a Chicago firm long engaged in the business, are among the world's largest manufacturers of punch boards and push cards. They manufacture some 5,000 different types of the one and about 3,000 different kinds of the other. Their annual sales aggregate more than 2,000,000 of such devices, which are sold to manufacturers of various other articles of merchandise and to both wholesale and retail dealers in other merchandise. The Commission found that, in the course and conduct of their business, petitioners caused their manufactured devices, when sold, to be transported from their place of business in Illinois to purchasers in various other states of the Union; and that they maintain "a course of trade in their punch boards and push cards in commerce among and between the various states of the United States."

The Commission found specifically that, among the various types of punch boards and push cards manufactured and sold by petitioners, many are designed for use by retail dealers in the sale and distribution of merchandise to the public "by means of a game of chance, gift enterprise or lottery scheme."

In its findings, the Commission describes the punch boards and push cards, which vary in detail but all involve the same principle.[1] Many of petitioners' products are made to order to meet the requirements of the particular purchaser. In numerous instances, manufacturers and wholesale dealers, who purchase the punch boards and push cards from petitioners, make up assortments consisting of a board or card and a quantity of merchandise, and sell the complete assortment to a retail dealer.

The Commission found, further, that retail dealers used petitioners' devices in the sale and distribution of merchandise to the public and that the boards and cards of petitioners are designed and sold for that

---

[1] The punch boards contain a certain number of holes in which are placed slips of paper bearing different numbers or legends. These slips of paper are effectively concealed from view. Persons desiring to "play" the board pay to the operator thereof a designated sum, and thus become entitled to punch the board and to remove therefrom one of the slips of paper. Certain specified numbers or legends on the slips entitle purchasers to designated articles of merchandise without additional cost. Purchasers who do not punch a lucky or winning number receive nothing for their money other than the privilege of playing the board, or in some cases merchandise which is of much less value than that which would be received if lucky numbers were punched. The articles of merchandise are thus distributed to the public wholly by lot or chance. On some of the boards, the amount to be paid for the privilege of making the punch is also determined by chance.

The push cards are operated in substantially the same manner except that instead of having holes, the cards usually have perforated discs which contain the numbers or legends. As in the case of the boards, the numbers or legends are effectively concealed from the purchaser of the chance until after the punch has been made and the discs separated from the card. The punch boards range in size from fifty holes to ten thousand holes, while the push cards usually are much smaller, ranging in size from ten discs to one hundred discs.

Many of the boards and cards bear picturizations and descriptions of certain articles of merchandise, such as candy, cigarettes, etc., as well as instructions which explain the operation of the device and the prizes to be awarded to those obtaining lucky numbers. Others have no pictures or instructions thereon but have blank spaces in which the purchaser of the device may insert his own instructions and a statement of the merchandise to be awarded as prizes. Some of the punch boards are known as "cutout" boards, which means that the board contains a large hole or depression in which may be exhibited a sample of the merchandise offered by the dealer.

specific purpose, as evidenced, not only from the make-up of the boards and cards, but also from statements contained in the catalogues advertising petitioners' devices. Advertising statements of petitioners quoted by the Commission in its findings are set out in a footnote.[2]

The Commission found that petitioners thus supply and place in the hands of retail dealers, either directly or indirectly, the means of conducting lotteries or games of chance in the sale of merchandise to the general public: "a practice which is in contravention of an established public policy of the Government of the United States"; and that, through the supplying of such means petitioners knowingly and purposely assist and participate in the violation of this public policy.

In its findings, the Commission asserted that many retail dealers do not make use of lotteries or games of chance in the sale or distribution of merchandise, and that many manufacturers of and wholesale dealers in merchandise do not supply to their retailers the means of conducting lotteries. In consequence of the popular appeal of games of chance, much trade is diverted from these dealers, manufacturers and wholesalers, to competitors who do not supply such lotteries or games of chance.

The final finding of the Federal Trade Commission stated: "The practice of respondents [petitioners here] in selling and distributing their lottery devices thus serves to place in the hands of others means and instrumentalities whereby they are enabled to use unfair methods of competition and thereby unfairly to divert substantial trade to themselves from those who do not use such methods."

The Commission concluded: "The acts and practices of the respondents as herein found are all to the prejudice of the public and constitute unfair acts and practices in commerce within the intent and meaning of the Federal Trade Commission Act."

 In our view, all the findings of fact of the Federal Trade Commission are supported by evidence, disclosed in the record. The Federal Trade Commission Act distinctly provides that the findings of the Commission as to the facts, if supported by evidence, shall be conclusive. 52 Stat. 111, 15 U.S.C.A., § 45. Accordingly, the findings of the Commission must be and are accepted here. The Act declares unlawful "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." The word "commerce" means, of course, "interstate commerce." By the terms of the Act, the Com-

---

2 "A Few Points Worth Knowing. * * *

"Huge Candy Sales

"Last year over $30,000,000 worth of Candy was sold by means of Sales Boards. Over half of all the box candy sold in the United States was sold in this manner and over 75% of all Candy Manufacturers and Jobbers used Brewer Boards and Cards to build up their volume.

"Tobacco Industry Reaps Profits

"The same is true of the Tobacco Industry. Millions of Dollars worth of cigars and cigarettes were sold by the use of Brewer Boards and Cards. The Candy and Tobacco industries were not the only ones to reap extra profits. Hundreds of other items were sold in this same manner and with like success.

"Eliminate Slack Seasons

"Brewer Boards have a year round appeal to every class of trade and give quick turnover—and quick turnover means added Profits. There are no slack seasons when Brewer Boards are used.

"Live Retailers Use Boards

"Thousands of people in every community enjoy punching Boards. The 'up to the minute' retailer, realizing this, uses them to bring customers to his store. They build up his sales volume and boost his profits.

"Board Sales Bring Other Sales

"Compare two stores—one using Brewer Boards and one not using them —other factors being equal the one with Brewer Boards invariably has the largest group of regular customers. There is a certain thrill to punching boards and the public will favor the store using them. Records show that the average customer who spends 25c to 50c will spend twice this amount when the storekeeper uses Brewer Boards—and in addition to this the customer usually makes other purchases while in the store.

"Are You Getting Your Share?

"Thousands of merchants are increasing their sales in this manner. Are you getting your share of this business?"

mission is vested with the power to issue cease and desist orders from the use of methods of competition, or acts, or practices, condemned by the Act.

The petitioners contend that the Federal Trade Commission lacks jurisdiction to issue a cease and desist order, forbidding them to sell and distribute punch boards and push cards or other lottery devices in interstate commerce, inasmuch as they sell only to those independently engaged in the sale of merchandise to the public and have no interest in or connection with such independent sale or distribution of merchandise, or in the trade affected by such sales. From the foregoing analysis of the Commission's findings, however, it seems that the petitioners are not as independent of those to whom they sell and ship their products in interstate commerce as they would make it appear. With deliberate intent, using channels of interstate commerce, they put into the hands of others, including manufacturers and wholesale and retail dealers, the means of using "unfair methods of competition" and "unfair or deceptive acts or practices." Manufacturers and wholesale dealers who purchase their made-to-order punch boards and push cards frequently make up complete assortments of merchandise and boards or cards, which find their way into interstate commerce.

For the reasons hereinafter appearing, we have reached the conclusion that, in thus aiding and abetting, inducing and procuring manufacturers and wholesale and retail dealers in merchandise to use unfair or deceptive acts or practices and unfair methods of competition, Charles A. Brewer and Son, though manufacturing no merchandise except the lottery devices which they ship in interstate commerce, fall within the restraining power of the Federal Trade Commission as vested by the Federal Trade Commission Act. 52 Stat. 111.

The Supreme Court, in Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 494, 42 S.Ct. 384, 386, 66 L.Ed. 729, thus spoke, through Mr. Justice Brandeis: "The honest manufacturer's business may suffer, not merely through a competitor's deceiving his direct customer, the retailer, but also through the competitor's putting into the hands of the retailer an unlawful instrument, which enables the retailer to increase his own sales of the dishonest goods, thereby lessening the market for the honest product. *That a person is a wrongdoer who so furnishes another with the means of consummating a fraud has long been a part of the law of unfair competition.*" [Italics supplied.] The Supreme Court cited the opinion of Judge Denison of this court in Coca Cola Co. v. Gay-Ola Co., 6 Cir., 200 F. 720, a landmark case in the development of the law of unfair competition. See also Chicago Silk Co. v. Federal Trade Commission, 7 Cir., 90 F.2d 689, 691; Deer v. Federal Trade Commission, 2 Cir., 152 F.2d 65.

In Federal Trade Commission v. Raladam Co., 283 U.S. 643, 648, 649, 51 S.Ct. 587, 590, 75 L.Ed. 1324, 79 A.L.R. 1191, upon which stress is laid by petitioners, the words "unfair method of competition" were said to belong to that class of phrases which do not admit of precise definition but the meaning and application of which must be arrived at by the gradual process of judicial inclusion and exclusion. It was considered obvious that the word "competition'"" imports the existence of present or potential competitors. There was no departure from the doctrine of the Winsted case. There was merely found lacking the existence of competition on the facts of the case.

In the second Raladam case, Mr. Justice Black said: "One of the objects of the Act creating the Federal Trade Commission was to prevent potential injury by stopping unfair methods of competition in their incipiency." Federal Trade Commission v. Raladam Co., 316 U.S. 149, 152, 62 S.Ct. 966, 968, 86 L.Ed. 1336. The practices of which complaint was made in both the first and the second Raladam cases, however, were prior to the March 21, 1938, amendment of the Federal Trade Commission Act, which added the words "unfair or deceptive acts or practices in commerce" to the former phrase "unfair methods of competition in commerce." This makes it now unnecessary that effect on competition be shown. For discussion of the effect of this amendment, see Pep Boys—Manny, Moe

& Jack, Inc., v. Federal Trade Commission, 3 Cir., 122 F.2d 158, 161; Scientific Mfg. Co. v. Federal Trade Commission, 3 Cir., 124 F.2d 640, 643.

The opinion of Mr. Justice Stone later Chief Justice, in Federal Trade Commission v. R. F. Keppel & Bro., Inc., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814, has important bearing in the instant case; for there, a cease and desist order of the Federal Trade Commission was upheld upon a showing that a manufacturer sold and distributed in interstate commerce candy in a certain type package in assortments, so arranged and offered for sale as to avail of the element of chance as an inducement to the retail purchaser. It was declared (291 U.S. at page 313, 54 S.Ct. at page 426, 78 L.Ed. 814) that: "Without inquiring whether, as respondent contends, the criminal statutes imposing penalties on gambling, lotteries and the like, fail to reach this particular package in most or any of the states, it is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy."

As early as 1879, the Supreme Court, in a memorable opinion by Chief Justice Waite in which the Dartmouth College case (Trustees of Dartmouth College v. Woodward) 4 Wheat. 518, 4 L.Ed. 629, was differentiated, held that a legislative grant of a charter to a lottery company for twenty-five years was, in legal effect, nothing more than a license to enjoy the privilege conferred for the time, *subject to future legislative or constitutional control or withdrawal.* [Italics supplied.] It was emphatically asserted that no legislature, or even the people themselves, can bargain away the public health or the public morals. Stone v. State of Mississippi, 101 U.S. 814, 819, 25 L.Ed. 1079.

Thus, it is established beyond controversy that the Federal Trade Commission stands upon solid ground in declaring the sale of merchandise by lottery methods as in contravention of the public policy of the United States.

As was pointed out in Maltz v. Sax, 7 Cir., 134 F.2d 2, 4, though neither the manufacture nor sale of gambling devices may be specifically prohibited by federal statute, the use of such devices has met with uniform condemnation in the courts of the United States in proceedings where the Federal Trade Commission has sought to prevent their use as violative of the Federal Trade Commission Act.

The Seventh Circuit Court of Appeals has made valuable contribution to the subject matter of merchandising through lottery devices; and we are in accord with the rationale of that court's decisions in the cases cited below: Chicago Silk Co. v. Federal Trade Commission, 7 Cir., 90 F. 2d 689, supra; Kritzik v. Federal Trade Commission, 7 Cir., 125 F.2d 351; Koolish v. Federal Trade Commission, 7 Cir., 129 F.2d 64; Wolf v. Federal Trade Commission, 7 Cir., 135 F.2d 564; Jaffe v. Federal Trade Commission, 7 Cir., 139 F. 2d 112; Modernistic Candies v. Federal Trade Commission, 7 Cir., 145 F.2d 454, 455. In all these cases, the orders of the Federal Trade Commission, requiring the respondents to cease and desist from the lottery practices in merchandising, were affirmed. In the last-cited case, the court said: "It is clear that the Federal Trade Commission has the power to eradicate merchandising by gambling in interstate commerce. We think the Commission also has the power to prohibit the distribution in interstate commerce of devices intended to aid and encourage merchandising by gambling. The gamblers and those who deliberately and designedly aid and abet them are both engaged in practices contrary to public policy. Merchandising by gambling should not be divided into insulated acts, which appear innocent when examined separately. This unfair practice should be viewed as a whole. If the Federal Trade Commission is to police merchandising by gambling, it must police those who designedly and deliberately aid and abet this practice. We think the Commission has such power."

In Ostler Candy Co. v. Federal Trade Commission, 10 Cir., 106 F.2d 962, 965, the Circuit Court of Appeals declined to set aside cease and desist orders, where the Federal Trade Commission had found on

substantial evidence that the sale and distribution of "chance candy" in interstate commerce, and its sale at retail, come into competition with the sale and distribution of "straight candy"; that trade and volume are diverted from business enterprises not using such methods; and that prejudice to the public ensues.

Federal Trade Commission v. F. A. Martoccio Co., 8 Cir., 87 F.2d 561, 564, is a well-reasoned case from the Eighth Circuit, upholding an order of the Federal Trade Commission against the use of punch boards or push cards in merchandising candy in interstate commerce. The opinion recognizes the principle of the Winsted Hosiery Company case, supra, that wrongfully furnishing another with the means of consummating a fraud is an established part of the law of unfair competition.

The Court of Appeals for the Second Circuit affirmed an order of the Federal Trade Commission, restraining the use of bingo paraphernalia in aid of the sale of merchandise in violation of Section 5 of the Federal Trade Commission Act. Deer v. Federal Trade Commission, 152 F.2d 65, supra. See also Parke, Austin & Lipscomb v. Federal Trade Commission, 2 Cir., 142 F.2d 437, 441. The reasoning of the court in these two cases is in line with that of the authorities which have been cited from other circuits.

The opinion in Scientific Manufacturing Co. v. Federal Trade Commission, 3 Cir., 124 F.2d 640, apparently conflicts with that in Modernistic Candies, Inc. v. Federal Trade Commission, supra, with which we find ourselves in accord. The Scientific case may perhaps be differentiated on the fact that, in selling pamphlets derogatory of aluminum cooking utensils, the petitioner in that case did not deal in devices but "dealt," as stated by the court, "in opinions and no more." In Perma-Maid Co. v. Federal Trade Commission, 6 Cir., 121 F.2d 282, no warrant was found by our court for setting aside the cease and desist order issued by the Federal Trade Commission, where salesmen, according to the findings of the Commission, had made false representations as to aluminum utensils.

The main reliance of petitioners is upon the opinion of the Supreme Court in Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 61 S.Ct. 580, 582, 85 L. Ed. 881. It was there held that the Federal Trade Commission is without authority under Section 5 of the Act to prevent an Illinois candy manufacturer from selling wholly within that State candy in "break and take" packages, making the amount the purchaser receives dependent upon chance. In the concluding paragraph, the writer of the majority opinion said it was merely held that to read "unfair methods of competition in [interstate] commerce" as though it meant "unfair methods of competition in any way affecting interstate commerce," requires, in view of all the relevant considerations, much clearer manifestation of intention than Congress has furnished. The case is plainly distinguishable from that at bar, in that, in the Bunte Brothers case, the sale of the petitioner's products was entirely within the State of Illinois. Here, the petitioners ship in interstate commerce throughout the United States their manufactured lottery devices.

We find no merit in the argument of the petitioners that there is a fatal variance between the allegations of the complaint and the findings of fact by the Commission. Considering the complaint in entirety, the findings are not sufficiently broadened to expand illegitimately inhibition of the methods, acts and practices of which complaint is made.

The other contentions of petitioners are deemed of insufficient consequence to require discussion.

The petition to review is dismissed, the order of the Commission is affirmed, and the petitioners are commanded forthwith to obey the terms of the Commission's order.