COLGATE–PALMOLIVE COMPANY,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

TED BATES & COMPANY, Inc.,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 5972, 5986.

United States Court of Appeals
First Circuit.

Nov. 20, 1962.

Mathias F. Correa, New York City, with whom Arthur Mermin, Corydon B. Dunham, New York City, John F. Groden, Boston, Mass., Cahill, Gordon, Reindel & Ohl, New York City, and Withington, Cross, Park & McCann, Boston, Mass., were on brief, for petitioner Colgate-Palmolive Co.

Joseph A. McManus, New York City, with whom Lane McGovern, Boston, Mass., Coudert Brothers, New York City, and Ropes & Gray, Boston, Mass., were on brief, for petitioner Ted Bates & Co.

Miles J. Brown, Washington, D. C., Attorney, with whom James McI. Henderson, General Counsel, J. B. Truly, Assistant General Counsel, and Frederick H. Mayer, Washington, D. C., Attorney, were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

These petitions to review and set aside a cease and desist order of the Federal Trade Commission are noteworthy principally because of the extremes to which the dispute has led the parties. We shall refer to the petitioners as they were below, viz., as respondents. Respondent Colgate-Palmolive Company, with the aid and at the suggestion of its advertising agency, respondent Ted Bates & Company, in 1959 released three substantially similar television commercials (hereinafter referred to in the singular) to advertise the "moisturizing" qualities of Colgate's pressurized[1] shaving preparation Palmolive Rapid Shave, hereinafter the cream. The commercial was a dramatic "audio" and "video" exposition in which sandpaper was apparently shaved with a safety razor with a single stroke immediately following the application of the cream. This demonstration, it was vocally claimed, "proved" the moisturiz-

1. See Carter Products, Inc. v. Colgate-Palmolive Co., 4 Cir., 1959, 269 F.2d 299

ing qualities of the cream and that it would have the same effect "for you." In fact the demonstration did not employ sandpaper at all, but a simulated mock-up of sand on plexiglass. The Commission brought a civil complaint against respondents, charging misrepresentations in that " * * * said visual demonstration was a 'mock-up' * * * [and] does not prove the 'moisturizing' properties of Palmolive Rapid Shave, in actual use, for shaving purposes." Respondents' answers admitted that the demonstration was a mock-up, but asserted that the "commercials contained a fair and true illustration of the otherwise proven fact that Palmolive Rapid Shave has excellent wetting qualities." Following a trial the Commission issued a broad order against both respondents of which they now seek review.

 Respondents' first defense is that the cream did in fact permit the shaving of sandpaper as apparently shown, so that there was no misrepresentation. This claim is conspicuously lacking in merit. Ordinary coarse sandpaper can be shaved, but not until the cream has remained upon it for upwards of an hour. Even if we could assume that a particularly fine grade of paper, described as "finishing paper," could fall within the common understanding of what the audio portion described as "tough" [2] sandpaper, which we may doubt, and even if the visual demonstration, which was clearly of a coarse [3] brand of sandpaper, did not conclusively foreclose that assertion in this case, which we doubt even more, respondents are not aided. Their best evidence was

that even finishing paper required that the cream rest upon it for one to three minutes before shaving was possible. The video portion of the demonstration shows no such inconvenient wait, but graphically exhibits no pause or break between the application of the cream to the paper, the reaching for the razor, and the shaving operation. It is true that the accompanying audio portion of the commercial uses the word "soak." Respondents contend that soaking means an appreciable passage of time. The Commission was well warranted in finding that the word "soak" was so unobtrusive that many viewers might not notice it, and that even those who did might conclude that the length of the announced soaking was not one to three minutes or more, but the insignificant interval defined by the visual portrayal, the same as was shown for "soaking" the human beard.[4] It should be obvious by now to anyone that advertisements are not judged by scholarly dissection in a college classroom. F. T. C. v. Standard Education Society, 1937, 302 U.S. 112, 116, 58 S.Ct. 113, 82 L.Ed. 141; Aronberg v. F. T. C., 7 Cir., 1942, 132 F.2d 165.

Respondents next contend that the length of time required to shave sandpaper was not within the pleadings. We agree with them that the Commission did not happily phrase its order denying a motion to amend the complaint. Although respondents predicate some argument on this denial, which the Commission might well have anticipated, one may nevertheless question how seriously they were misled into thinking the issue

2. Respondents object to the Commission's reference to the adjective "tough" because it was not specifically mentioned in the complaint, and elsewhere make other, similar, objections. There was no dispute as to what was in the commercial. We can not think the complaint had to set forth every word.

3. Counsel for respondents claim that the purported sandpaper looked coarser on the movie exhibit introduced in evidence by the Commission than it appeared to the television viewers. Apart from the

absence of evidentiary support for this contention, it is pointless in the light of the candid testimony of one of Bates' employees that the commercial's sandpaper appeared coarser than the finishing paper on which respondents rely.

4. Respondents do not make the contrary suggestion that beards, too, must be soaked for one to three minutes. Indeed, they could not, without making the picture a serious misrepresentation in another respect.

was simply whether sandpaper of a variety not depicted could eventually be shaved, when the complaint plainly charged that the "commercials, which include a visual demonstration * * * represented, directly or by implication, that * * * it is possible to forthwith shave off the rough surface of said sandpaper * * *." More important, respondents have not been able to suggest to us how, in the light of the evidence which they introduced after a suitable interval to prepare against the Commission's showing, they have been prejudiced. Rather, we think they are simply trying to restrict the issue to one they might be able to meet, instead of one they plainly cannot. The Commission rejected this attempt, and we agree.

■ Next, respondents assert that the commercial, even if not true with respect to sandpaper, was mere metaphorical puffing; that there is no contention that the cream did not possess entirely adequate moisturizing properties for shaving humans (the Commission makes no claim of inadequacy of the cream); that no one bought the cream intending to shave sandpaper, and that therefore there was no misrepresentation as to any material matter. Within limits we are sympathetic with the principle allegedly underlying respondents' contention. Graphic visual demonstrations that have dramatic appeal may well be mere puffing. References to sandpaper beards may of themselves be harmless, and so may be pictures illustrating the analogy. We see no objection to obvious fancy, provided there is no underlying misrepresentation. But respondents' difficulty is that they do not come under any such principle. They went far beyond generalities and eye-catching devices into asserting as a fact that the cream enables sandpaper to be shaved forthwith, and that this fact "proved" the cream's properties for shaving humans. They cannot now suggest that ability

to shave sandpaper forthwith was an irrelevant fact and an irrelevant representation.[5] We agree with the Commission that it is immaterial that the cream may in fact have adequate shaving qualities. If a misrepresentation is calculated to affect a buyer's judgment it does not make it a fair business practice to say the judgment was capricious. Mohawk Refining Corp. v. F. T. C., 3 Cir., 1959, 263 F.2d 818, cert. den. 361 U.S. 814, 80 S.Ct. 53, 4 L.Ed.2d 61; C. Howard Hunt Pen Co. v. F. T. C., 3 Cir., 1952, 197 F.2d 273.

■ It may well be that little injury was done to the public by respondents' representations. We suggested in our opening sentence that we consider this a rather trivial case. Nonetheless, we could not possibly say that it was not within the province of the Commission to conclude that such conduct should be forbidden. Colgate's motion to dismiss the complaint was properly denied.

■ Respondent Bates contends that as a mere advertising agency no order should be entered against it in any event. On one occasion the Commission has drawn such a distinction on the ground that the agency was but a secondary actor. This ruling, however, was expressly stated to be a matter of "sound discretion." Bristol-Myers Co. et al., 1949, 46 F.T.C. 162, 176. Where, as here, the Commission was warranted in finding that the advertising agency was an active, if not the prime, mover, we could not say that the Commission lacked either jurisdiction or discretion. Cf. C. Howard Hunt Pen Co. v. F. T. C., supra 197 F.2d at 281; Chas. A. Brewer & Sons v. F. T. C., 6 Cir., 1946, 158 F.2d 74; see also National Cash-Register Co. v. Leland, 1 Cir., 1899, 94 F. 502, 507, cert. den. 175 U.S. 724, 20 S.Ct. 1021, 44 L.Ed. 337.

Very different questions, however, arise when we come to the scope of the order. The interdiction of which re-

---

5. The Commission makes an interesting counter-suggestion. If shaving sandpaper did *not* prove something about shaving humans, was there not a still further misrepresentation?

spondents principally complain prohibits the following:

"Representing, directly or by implication, in describing, explaining, or purporting to prove the quality or merits of any product, that pictures, depictions, or demonstrations, either alone or accompanied by oral or written statements, are genuine or accurate representations, depictions, or demonstrations of, or prove the quality or merits of, any product, when such pictures, depictions, or demonstrations are not in fact genuine or accurate representations, depictions, or demonstrations of, or do not prove the quality or merits of, any such product."

Analysis of this portion of the order shows it to be quite ambiguous. On first reading we had thought that, in effect, it simply forbade demonstrations which represented a product as doing something that it could not do, or as appearing to have qualities which it did not possess. There could be no objections to such an order, except respondents' special objection that this particular one embraces too many products. But respondents say that the language goes far beyond such conduct, and would prohibit any demonstration even if it did not misstate facts about, or misrepresent the appearance of, the product, if it was not "genuine" in that the actual substance used in the studio, because of technical problems of photography, was not the product itself. In other words, it would be no defense that, as the examiner found on undisputed testimony here, the shaving of sandpaper, even when in fact accomplished, does not properly reproduce on television and must be simulated to be effective. Similarly, it appears that coffee, orange juice and iced tea lose their true colors, so that artificial substances have to be substituted to make them look natural, while in another area products such as ice cream and the "head" on beer melt under the hot camera lights and require the use of more stable substitutes. On consideration we agree with respondents that the order may be read as forbidding such conduct. Furthermore, we believe that this was the Commission's intention.[6] In its opinion accompanying the order the Commission stated that one of the issues was whether, even if the cream permitted the shaving of sandpaper precisely as pictured, there was "nonetheless a misrepresentation * * * and an unfair advertising practice." The Commission resolved this issue by concluding that it was "an illegal practice," and was likely to deceive the public and cause purchasers to buy what otherwise they would not have bought.[7]

We, of course, agree with the Commission that there is a misrepresentation, of a sort, in any substitution case. But we are unable to see how a viewer is misled in any material particular if the only untruth is one the sole purpose of which is to compensate for deficiencies in the photographic process. The Commission has put the shoe on the wrong foot. What the viewers are interested in, and moved by, is what they see, not by the means. We suggested to counsel that this could be readily tested. Suppose,

---

6. Indeed, the Commission seemed eager to raise this question. For example: "Thus, while the particular facts of this case may seem trivial, it raises the broad question whether mock-ups or simulated props may lawfully be used in television commercials to demonstrate qualities claimed for products, where the audience is told that it is seeing one thing being demonstrated while actually it is seeing something different."

7. To be doubly sure our understanding of the Commission's position was correct, we put the following case to its counsel.

Suppose a prominent person is photographed saying, "I love Lipsom's iced tea," while, apparently, he drinks a glass of iced tea. In truth the individual does like Lipsom's tea, and frequently drinks it, but for the above-mentioned technical reasons is then drinking colored water. What the viewer sees on the screen looks exactly as Lipsom's iced tea does in fact look. Asked if this would be misconduct, counsel replied that it was the Commission's position that it would be, because the viewer has been led to believe he is seeing iced tea when in fact he is not.

in the case of color television, a milk producer wishes to advertise the rich quality of his cream. Obviously he cannot use a foreign substance so that his product will appear yellower and richer than it is. But, equally, should he be allowed to use his own cream if he knows that by the normal photographic process its color would be changed so as to appear substantially better on the screen than it was? We suspect the Commission would think it clear he could not. Yet if he used an artificial substance in order to produce the exactly correct appearance, under the Commission's rule there would be deceit. Counsel gave no answer. We are not critical of counsel, because we think his client has left him without one.[8]

■ The Commission has confused two entirely different situations. Of course, as we have already said, if a purported demonstration attributes to a product qualities it does not in fact possess, the advertiser will not be permitted to say that the product can still do all it needs to do, or is "just as good" even though it does not have the claimed characteristic. The Commission properly said that the customer is entitled to get what he is led to believe he will get, whether he is right or wrong in thinking it makes a difference.[9] But where the only untruth is that the substance he sees on the screen is artificial, and the visual appearance is otherwise a correct and accurate representation of the product itself, he is not injured. The viewer is not buying the particular substance he sees in the studio; he is buying the product. By hypothesis, when he receives the product it will be exactly as he understood it would be. There has been no material deceit.

■■ The present order must be set aside. We do not, of course, suggest that it was erroneous in every particular, but the Commission's fundamental error so permeates the order that we think it best that an entirely new one be prepared. We also think it best that the Commission be the one to do so. We will make, however, two suggestions. The Commission has directed this part of its order to every kind of product that Colgate may hereafter advertise, and, in the case of Bates, with regard to every customer. If mock-ups, or what the Commission chooses to call demonstrations that are not "genuine," were illegal per se, then it might be appropriate, although we need not decide, to enter a broad order forbidding all such demonstrations en masse. We have undercut the basis for any such order. Under our construction there is no showing of any "method" or "practice" in the sense discussed by the Commission in its opinion. Respondents' only offense was the making of a single misrepresentation about a single product. The fact that this was accomplished by a "demonstration" did not warrant a broad order against all future misrepresentations of any kind by demonstrations any more than the fact that a misrepresentation was made in print would jus-

---

8. We realize that counsel might have replied that products which do not photograph accurately should never be represented. This would seem—at least to those who use television commercials—a drastic remedy. We believe the burden should be on the Commission to demonstrate an equivalent need.

9. The Commission also relied on what it called "phony" testimonial cases. F. T. C. v. Standard Education Society, supra, 302 U.S. at 118, 58 S.Ct. at 116; Niresk Industries, Inc. v. F. T. C., 7 Cir., 1960, 278 F.2d 337, cert. den. 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104. We would agree that it is an unfair advertising practice to publish a purported testimonial when

none had been received, even if, from the fact that the advertiser's sales were high and constant, it must be obvious that he has many satisfied customers. A more accurate analogy would be if the advertiser did in fact receive a testimonial, but written in ink that would not photograph. Would the advertiser be guilty of deceit if he copied it over and photographed the copy? If an endorser may not be shown enjoying colored water that looks like, but is not, iced tea, then, seemingly, it would not be "genuine" to photograph a copy of a testimonial leading viewers to believe it was an original document. It is difficult to think the Commission fully appreciated the principle it has espoused.

tify an order against all future misrepresentations of any kind by printing. The Commission has revealed that it is well aware of the scope to be applied to single misrepresentations, and we need say no more on this subject. See e. g., Colgate-Palmolive Co., Docket No. 7660, March 9, 1961, Trade Reg.Rep., (1960–61 Transfer Binder) ¶ 29445.

Secondly, with respect to the respondent Bates, we think there may well be distinction between a principal and an agent in the permissible scope of an order. In some degree a principal may well be held to advertise at his peril. But we have reservations as to how far it is appropriate to go in the case of an agent, in the absence, at least, of any suspicion on its part that the advertisement is false. Cf. Bristol-Myers Co., supra.

Judgment will be entered setting aside the order of the Commission. Further proceedings to be in accordance with this opinion.