CARTER PRODUCTS, INC., and Sullivan, Stauffer, Colwell & Bayles, Inc., Appellants,

v.

FEDERAL TRADE COMMISSION, Appellee.

No. 19778.

United States Court of Appeals Fifth Circuit.

Sept. 27, 1963.

William L. Hanaway, Breed, Abbott & Morgan, New York City, for petitioners-appellants Carter Products, Inc., and Sullivan, Stauffer, Colwell & Bayles, Inc., Stoddard B. Colby, New York City, of counsel.

Richard W. Whitlock, Atty., J. B. Truly, Asst. Gen. Counsel, James McI. Henderson, Gen. Counsel, F. T. C., Washington, D. C., for Federal Trade Commission.

Before PHILLIPS,* WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

Everyone knows that on TV all that glisters is not gold. On a black and white screen, white looks grey and blue looks white: the lily must be painted. Coffee looks like mud. Real ice cream melts much more quickly than that firm but fake sundae. The plain fact is, except by props and mock-ups [1] some objects cannot be shown on television as the viewer, in his mind's eye, knows the essence of the objects.

The technical limitations of television, driving product manufacturers to the substitution of a mock-up for the genuine article, if they wish to use what they may regard as perhaps their most effective advertising medium, often has resulted in a collision between truth and salesmanship.[2] "What is truth?", has

---

* Of the Tenth Circuit, sitting by designation.

1. "In advertising a 'prop' or 'mock-up' is an object or device used in a television commercial for a particular purpose relevant to the commercial message. Frequently it is something made solely for use in the commercial and often it is made to simulate a real object." Comment,

Illusion or Deception: The Use of "Props" and "Mock-ups" in Television Advertising, 72 Yale L.J. 145 (1962).

2. "As to the asserted technical limitations of the medium, the Commission is inclined to be somewhat skeptical. We doubt that the skills and resources available in television photography, in an industry which has made such striking tech-

been asked before. On television truth is relative. Assuming that collisions between truth and salesmanship are avoidable, i. e., that mock-ups are not illegal *per se*, the basic problem this case presents is: what standards should the Federal Trade Commission and the courts work out for television commercials so that advertisers will appear to be telling the truth, consistently with Section 5 of the Federal Trade Commission Act prohibiting unfair advertising practices.

This case is before us on petition for review of an order issued by the Federal Trade Commission directing the petitioners to cease and desist from engaging in certain unfair methods of competition in violation of Section 5 of the Act, 15 U.S.C.A. § 45.[3]

The Commission charges Carter Products, Inc., manufacturer of a popular aerosol shaving cream, "Rise", and other products, with having falsely represented in television commercials that shaving creams competing with Rise dry out during the course of a shave, while Rise stays moist and creamy. Sullivan, Stauffer, Colwell & Bayles, Inc., an advertising agency handling the Rise account, and S. Heagan Bayles, an executive of the agency, are also charged.

The Hearing Examiner found that the advertisement was misleading, unfair, and damaging to competing products of Rise. He dismissed the action against Bayles in his individual capacity. The Commission approved the findings of the Examiner but narrowed the scope of the Examiner's cease and desist order.

This Court viewed the Rise commercial. It opened with a silhouette of a man shaving with "ordinary" instant cream. A jagged line followed the razor down his face. A voice said, "Guard against razor scratch". After the picture and the words were repeated, a close-up showed a man shaving in great discomfort; the lather had dried out. Superimposed on this picture were the words, "Ordinary Lathers Dry Out." The announcer said: "The scratches,

---

nological advances in recent years, are as inadequate as they have been portrayed to us by the counsel for respondents. However, assuming it to be the fact that there are indeed such limitations in television photography, the Commission can appreciate that these 'technical' difficulties could give rise to problems for sponsors and agencies in determining how most effectively to use television in advertising their products. The limitations of the medium may present a challenge to the creative ingenuity and resourcefulness of copywriters; but surely they could not constitute lawful justification for resort to falsehoods and deception of the public. The argument to the contrary would seem to be based on the wholly untenable assumption that the primary or dominant function of television is to sell goods, and that the Commission should not make any ruling which would impair the ability of sponsors and agencies to use television with maximum effectiveness as a sales or advertising medium.

"Stripped of polite verbiage, the argument boils down to this: Where truth and television salesmanship collide, the former must give way to the latter. This is obviously an indefensible proposition. The notion that a sponsor may take liberties with the truth in its television adver-

tising, while advertisers using other media must continue to be truthful, is patent nonsense. The statutory requirements of truth in advertising apply to television no less than to other media of communication. Adherence to the truth should be no more of an impediment to effective advertising in television than in any other medium." Opinion of the Commission in Colgate-Palmolive, No. 7736, Dec. 29, 1961; 3 Trade Reg. 15,643.

3. The pertinent provisions of the Act are: "Sec. 5(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful." 66 Stat. 632 (1952), 15 U.S.C. § 45(a) (1) (1958). "Sec. 5(a) (6) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 66 Stat. 632 (1952), 15 U.S.C. § 45(a) (6) (1958). "Sec. 5(c) * * * [t]he findings of the Commission as to the facts, if supported by evidence shall be conclusive." 52 Stat. 112 (1938), 15 U.S.C. § 45(c) (1958)."

scrapes and burns you often get with ordinary aerated lathers that dry out on your face * * * and let your whiskers dry out, too. Your razor tugs and pulls." The picture then shifted to a can of Rise from which a rich, creamy lather was released onto a man's hands. "Stays Moist and Creamy" was flashed onto the screen. The next episode showed a man shaving with Rise. He was enjoying this shave. Again "Stays Moist and Creamy" appeared on the screen followed by the legend, "the wetter lather that DOESN'T DRY OUT". Throughout this happy scene the announcer described the virtues of Rise:

> But now there's a new instant lather * * * that stays moist and creamy * * * keeps your whiskers wet and soft all through your shave * * * gives you closer, more comfortable shaves. It's Rise patented small bubble lather * * * the richest, wettest lather ever made. Instead of drying out on your face * * * Rise wetter lather puts more moisture into whiskers * * * keeps them wet and soft * * * all through your shave. Guards against Razor scratch. * * * Gives you closer, more comfortable shaves in half the time. Shave with Rise * * * the wetter lather that doesn't dry out on your face.

4. The Commission found:

"When viewed and heard in its entirety, there can be no doubt that the commercial compares 'Rise' with all other competing aerated shaving creams. Neither the word 'ordinary' nor any other part of the commercial indicates that [petitioners] are distinguishing between low quality and high quality lathers. Insofar as the viewer can determine from the advertising an ordinary shaving cream is merely a shaving cream other than 'Rise.' Consequently, we believe that [petitioners'] advertising conveys the impression that all aerated lathers competing with 'Rise' dry out. Since the record shows that this is untrue, the representation is a false disparagement of those aerated shaving creams that do not dry out during the course of a shave. * * * Although it is true that [petitioners] represented that 'Rise' is superior to a dried-out lather, it is equally

As a matter of fact, the "ordinary lather" used in the commercial was not a lather. It was a mock-up. The white creamy-looking substance simulating shaving cream was made from a special formula consisting of 90 per cent water and a foaming agent known as "ultra-wet 60L". This imitation "ordinary lather" did not contain any soaps or fatty acid salts, the ingredients used to keep shaving cream from breaking down. It is not surprising therefore that the "lather" came out of the can in a good puff and then rapidly disappeared.

February 9, 1960, on advice of counsel, Carter Products stopped using that particular television advertisement. The Commission issued a complaint on June 15, 1960, alleging that the use of the simulated lather did "not [provide] a valid comparison of the respective qualities of 'Rise' and competing products as shaving lathers and tends to disparage competing lathers." [4]

The petitioners' major defense is that their commercial was not a comparison of Rise with all competing products, but was simply a comparison of the moisture-retaining properties of Rise with the drying-out properties of inferior shaving creams. They contend that practical limitations imposed by television photography and the necessity of completing

clear that they also represented that 'Rise' is superior to competing aerated shaving lathers because these lathers dry out and 'Rise' does not. The demonstration in the advertising purported to show why 'Rise' is superior. The viewer could observe and see for himself that other lathers dry out while 'Rise' remains 'moist and creamy'. To remove any doubts that this was the purpose of the demonstration, the words 'Ordinary Lathers Dry Out' were super-imposed on the picture. Since the product which was shown as dried out in the demonstration was a substance other than a shaving cream, having none of the characteristics of a shaving cream except the property of foaming, the demonstration did not show that competing lathers dry out faster than 'Rise', although it conveyed the impression that it did. The demonstration did not prove what it purported to prove and was therefore, false and deceptive."

the commercial within sixty seconds compelled the use of the mock-up.

## I.

■■■ A. First, in considering the Commission's findings and order, the reviewing court must recognize certain fundamental principles. "The meaning of advertisements or other representations to the public, and their tendency or capacity to mislead or deceive, are questions of fact to be determined by the Commission". Kalwajtys v. F. T. C., 7 Cir., 1956, 237 F.2d 654, cert. den'd, 1957, 352 U.S. 1025, 77 S.Ct. 591, 1 L.Ed. 2d 597. It is the Commission's function to find these facts and a court should not disturb its determination unless the finding is arbitrary or clearly wrong. Kalwajtys v. F. T. C.; Gulf Oil Corp. v. F. T. C., 5 Cir., 1945, 150 F.2d 106, 108. Furthermore, the Commission may draw its own inferences from the advertisement and need not depend on testimony or exhibits (aside from the advertisements themselves) introduced into the record. New Amer. Library of World Literature v. F. T. C., 2 Cir., 1954, 213 F.2d 143; see Zenith Radio Corp. v. F. T. C., 7 Cir., 1944, 143 F.2d 29. The Commission need not confine itself to the literal meaning of the words used but may look to the overall impact of the entire commercial.

■■ B. In non-television cases brought under Section 5(a) the law is clear that an advertisement is illegal if it contains a false claim inducing the purchase of a product inferior to the product the consumer bargained for. The false claim may be a quality,[5] an ingredient,[6] or effectiveness[7] the adver-

tised product does not have. Or the advertisement may disparage competing products by attributing to them inferiorities they do not possess.[8] In such cases the advertiser acquires a better competitive position in the market as a result of false and unfair practices. As Justice Cardozo said in Federal Trade Commission v. Algoma Lumber Co., 1934, 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655:

> "The consumer is prejudiced if upon giving an order for one thing, he is supplied with something else. * * In such matters, the public is entitled to get what it chooses, though the choice may be dictated by caprice or by fashion or perhaps by ignorance. Nor is the prejudice only to the consumer. Dealers and manufacturers are prejudiced when orders that would have come to them if the lumber had been rightly named, are diverted to others whose methods are less scrupulous." 291 U.S. at 78, 54 S.Ct. at 320, 78 L.Ed. 655.

The broad principle expressed by Justice Cardozo in 1934 has not lost any of its vitality.

C. In Colgate-Palmolive v. F. T. C., 1 Cir., 1962, 310 F.2d 89, 94, the "sandpaper" case, the First Circuit formulated the first judicial standards for testing the legality of props and mock-ups in television commercials. Colgate-Palmolive was not a case involving a comparison test and disparagement of competing products. However, we consider the standards worked out in that opinion well-reasoned, in keeping with principles established in non-television cases, and applicable to the case now before us.

---

5. In F. T. C. v. Algoma Lumber Co., 1934, 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655, the advertisement used the words "California white pine" to describe a less desirable yellow pine, "pinus ponderosa".

6. In Jacob Siegel Co. v. F. T. C., 1946, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888, an advertisement of fur coats featured the name "Alpacuna" when the product contained no vicuna fur.

7. In Carter Products, Inc. v. F. T. C., 9 Cir., 1959, 268 F.2d 461, cert. den'd

361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120, the court enforced an order requiring Carter Products Co. to delete the word "Liver" from the trade name of its "Little Liver Pills", when it was shown that the product had no curative or active effects upon the liver.

8. In Perma-Maid Co. v. F. T. C., 6 Cir., 1941, 121 F.2d 282 manufacturers of steel cooking ware were enjoined from advertising the food prepared in aluminum utensils causes ulcers and cancers.

In Colgate-Palmolive the commercial purported to demonstrate visually the moisturizing qualities of "Rapid Shave". It showed an actor applying Rapid Shave to what appeared to be sandpaper. Almost immediately after applying the cream, in one stroke of a razor the actor shaved the "sandpaper" clean; "Apply * * * soak * * * and off in a stroke." On television real sandpaper appears to be plain, colored paper, and cannot be shaved until it has soaked "upwards of an hour". As a mock-up, the advertiser used plexiglas covered with a jelly-like substance over which sand was sprinkled.

The Commission held that the commercial was deceptive, finding that Rapid Shave could not shave real sandpaper even after an hour's soaking. The Commission went further. It said that the fact no one buys Rapid Shave to scrape sandpaper is besides the point. Even if the commercial truthfully described Rapid Shave's effectiveness, according to the Commission, it was still deceptive and unfair advertising in that it "misinform[s] the viewer that what he sees being shown is genuine 'tough, dry sandpaper', rather than a plexiglas mock-up." [9] The Commission quoted from Algoma: "[T]he public is entitled to get what it chooses" and "substitution would be unfair though equivalence were shown." Thus, the Commission's view was that any mock-up, except perhaps, for background purposes, was illegal per se.[10]

The First Circuit agreed that the demonstration was deceptive,[11] but did not accept the Commission's criteria and set aside the order. Judge Aldrich, for the court, rejected the contention that "mock-ups, or what the Commission chooses to call demonstrations that are not 'genuine,' were illegal per se." He was "unable to see how a viewer is misled in any material particular if the only untruth is one the sole purpose of which is to compensate for deficiencies in the photographic processes." The Court reasoned:

"The Commission properly said that the customer is entitled to get what he is led to believe he will get, whether he is right or wrong in thinking it makes a difference. But where the only untruth is that the substance [the viewer] sees on the screen is artificial, and the visual

9. Opinion of the Commission, No. 7736, December 29, 1961; 3 Trade Reg.Rep. 15,643, at 20,480.

10. It was not always thus. Earl W. Knitner, former Chairman of the Commission has said:
"We realize that it is often difficult to impart true life quality to a product when it is photographed for television. * * * Where the use of props does not result in a material deception, the Federal Trade Commission would have no reason to complain. * * * Obviously, we recognize that it is impossible to photograph ice cream properly under hot lights. If you have to use shaving cream to get the kind of head which is normal on a glass of beer, this probably would not represent a material deception, unless, of course, it was carried beyond a reasonable point. If a glass goblet glistens too much, we still aren't likely to be alarmed." Advertising Age, Nov. 23, 1959.
In this very case the Hearing Examiner said:
"Reasonable latitude is and should be granted to advertisers and advertising agencies in the use of 'make-up' where necessary to meet the technical requirements of photography."

11. "We see no objection to obvious fancy, provided there is no underlying misrepresentation. But respondents' difficulty is that they do not come under any such principle. They went far beyond generalities and eye-catching devices into asserting as a fact that the cream enables sandpaper to be shaved forthwith, and that this fact 'proved' the cream's properties for shaving humans. They cannot now suggest that ability to shave sandpaper forthwith was an irrelevant fact and an irrelevant representation. We agree with the Commission that it is immaterial that the cream may in fact have adequate shaving qualities. If a misrepresentation is calculated to affect a buyer's judgment it does not make it a fair business practice to say the judgment was capricious." 310 F.2d at 92.

appearance is otherwise a correct and accurate representation of the product itself, he is not injured. The viewer is not buying the particular substance he sees in the studio; he is buying the product. By hypothesis, when he receives the product it will be exactly as he understood it would be. There has been no material deceit." 310 F.2d at 94.

■ We agree with that principle, and extend it in this case to demonstrations of competing products. Here, the mock-up was not used simply to compensate for the technical limitations in television. It was an unfair and inaccurate representation which distorted the comparison test and thereby disparaged Carter's competitors.

## II.

It is clear to us, as it was to the Commission, that there is no merit to Carter's contention that the commercial was designed to combat only the "ordinary, *inferior* lathers". The message is hammered home that "Rise" is *"the* richest, wettest lather ever made," and that it is *"the* lather that *doesn't* dry out," coupled with the corollary, *"Instead* of drying out on your face * * *"* Similarly, the unequivocal statement is made that *"no other lather* lets you shave so close * * *."* To this must be added the insistent message, prominently displayed on the screen (and backed by the model with the "ultra-wet 60L" on his face), that "Ordinary Lathers Dry Out," which is accompanied by the verbal assertion as to "ordinary aerated lathers that dry out on your face." And, as the Commission pointed out, the commercials do not indicate that the phrase "that dry out on your face" is intended as a qualification of the term "ordinary aerated lathers." In the overall context of the advertisement the comparison refers to all ordinary aerated lathers which compete with Rise and not just to inferior ones which dry out.

■ The record shows that the demonstration was false and misleading. There are competing products, some which are based on licenses from Carter, which do not dry out any more than Rise dries out. A vice-president of the advertising agency testified, for example:

"Hearing Examiner Poindexter: ·

*"But you do not consider the Palmolive Rapid Shave which is Commission's Exhibit 14, and the Gillette Foamy, which is Exhibit 15, break down and dry out?*

"The Witness:

"No. *They are well-made lathers.*

\* \* \* \* \* \*

"Q. Do any of those appear dried out, like this special formula that was used in the television commercials in comparison with Rise?

"A. No.

"Q. *Then you would say, would you not, that the television commercials were not a true comparison of the appearance of Rise and Palmolive Rapid Shave and Gillette ·Foamy; is that correct?*

"A. *Yes."*

As the Hearing Examiner found, neither "Rise" nor two other competing commercial lathers (Palmolive "Rapid Shave" and Gillette "Foamy") dried out as quickly as the special formula "ultra-wet 60L," and, moreover, seven other lathers (appearing in petitioners' *in camera* exhibits) did not dry out in one minute as did the "ultra-wet 60L." The Commission drew the same inference the Court draws: Carter used "ultra-wet 60L" because the actual competing lathers would not oblige by coming out of the can with a puff and drying quickly. The graphic visual demonstration was therefore false and misleading in that the artificial substance attributed characteristics to Rise's competing products which they did not possess.

In short, "ultra-wet 60L" deceived the viewer by ascribing false attributes to lathers in competition with Rise. It was not simply to compensate for the limitations in the advertising medium.

Substantial evidence and reasonable inferences support the Commission's findings.

## III.

Carter contends that since it abandoned the commercial four months before the complaint was filed, the order should be set aside. Abandonment of the illegal conduct does not render the controversy moot. Clinton Watch Co. v. F. T. C., 7 Cir., 1961, 291 F.2d 838. This is especially true when the Commission has already acted in the case. Eugene Dietzgen Co. v. F. T. C., 7 Cir. 1944, 142 F.2d 321. In C. Howard Hunt Pen Co. v. F. T. C., 3 Cir., 1952, 197 F.2d 273 the order was upheld even though the illegal practices had ceased years before the investigation had started. To the same effect is Spencer Gifts, Inc. v. F. T. C., 3 Cir., 1962, 302 F.2d 267 where the conduct in question had been abandoned several months before the Commission's inquiry began. Here the Commission determined that "there has been no showing of unusual circumstances which would indicate that entry of an order is unnecessary nor does it appear that there has been any change in the competitive conditions which may have influenced respondents to use advertising of the type under consideration." The petitioners' "assurance of discontinuance related only to the specific commercials and not to the practices at which the complaint is directed." See C. Howard Hunt Pen Co. v. F. T. C., 3 Cir., 1952, 197 F.2d 272, 281. We cannot say that the Commission abused its discretion in issuing the cease and desist order.

## IV.

Although we uphold the Commission on the merits, we have difficulty with the order. The order provides in part:

"It Is Ordered that respondents * * * do forthwith cease and desist from:

"(a) Disparaging the quality or properties of any competing product or products, through the use of false or misleading pictures, depictions or demonstrations either alone or accompanied by oral or written statements.

"(b) Representing directly or by implication that pictures, depictions or demonstrations either alone or accompanied by oral or written statements, accurately portray or depict the superiority of any product over competing products when such portrayal or depiction is not a genuine or accurate comparison of such product with competing products.

"And Further, in the advertising, offering for sale, or distributing of 'Rise' shaving cream, or any other shaving cream, in commerce, as 'commerce' is defined in the Federal Trade Commission Act, from misrepresenting the moisture retaining properties of competing shaving creams or otherwise falsely disparaging the quality or merits of competing products.

A. In Colgate-Palmolive the Court set aside an order forbidding the petitioners from

"[r]epresenting, directly or by implication, in describing, explaining, or purporting to prove the quality or merits of any product, that pictures, depictions, or demonstrations, either alone or accompanied by oral or written statements, are genuine or accurate representations, depictions, or demonstrations of, or prove the quality or merits of, any product, when such pictures, depictions, or demonstrations are not in fact genuine or accurate representations, depictions, or demonstrations of, or do not prove the quality or merits of, any such products."

Under that order, the use of mashed potatoes to advertise ice cream would be prohibited even though real ice cream would melt under the heat of the photographer's light, and mashed potatoes looks more like ice cream on the screen than ice cream itself. The Court said:

"[The order] would prohibit any demonstration even if it did not mistake facts about, or misrepresent the appearance of, the product, if it was not 'genuine' in that the actual substance used in the studio, because of

technical problems of photography, was not the product itself. In other words, it would be no defense that, as the examiner found on undisputed testimony here, the shaving of sandpaper, even when in fact accomplished, does not properly reproduce on television and must be simulated to be effective."

The order in this case suffers from the same infirmities. But, argues the Commission, this case, unlike Colgate-Palmolive, is predicated upon disparagement, deceptive comparison of competing products. Although this is true, the words "genuine or accurate" or open to the interpretation that the actual products used in the comparison must be the real thing.

In addition, we are uncertain whether the Commission intended to set up an either-or standard. In context, we take "accurate" to mean careful conformity to the truth, but it is a relative term permitting some variance from absolute truth. We regard "genuine" as an absolute term, meaning that the article is authentic.

The Carter order bears an obvious resemblance to the Colgate-Palmolive order which was framed at a time when the Commission was unyielding in its hostility to mock-ups. The utility of props and mock-ups in television commercials and the importance of advertising to the television industry suggest that the Commission should redraft the order in this case, in the light of this opinion and the new order in Colgate-Palmolive. See Federal Trade Commission v. Brock & Co., 1962, 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353.

The new order should focus on the misrepresentation of attributes rather than on substitution of a simulated article for the genuine article. The Commission may wish to consider (1) elimination of the word "genuine"; (2) recognition of the validity of demonstrations which compensate fairly for the technical limitations of television and communicate fairly to the viewer the actual qualities and characteristics of the objects which are simulated; (3) prohibition of props or mock-ups which distort the actual qualities or characteristics of the objects which are simulated.

■ B. Petitioners further complain that on the basis of the single misstep in relation to the advertisement of Rise the Commission makes its order applicable to all the products which Carter produces. The propriety of such an order depends upon the circumstances. Twice before this suit, Carter has litigated orders dealing with similar offenses. Carter Prods., Inc. v. F. T. C., 7 Cir. 1951, 186 F.2d 821 (deodorant); Carter Prods., Inc. v. F. T. C., 9 Cir., 1959, 268 F.2d 461, cert. den'd, 1959, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 ("Little Liver Pills"). In Niresk Industries, Inc. v. F. T. C., 7 Cir., 1960, 278 F.2d 337, cert. den'd, 1960, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 the court said:

"The findings of unfair and deceptive practices against petitioners were confined to their advertising and sale of the cooker-fryer, while the order of the Commission enjoins the use of like advertising by petitioners in conjunction with the sale of the fryer or any other product. Petitioners contend that the order must be restricted to their advertisement and sale of the cooker-fryer alone.

"We do not agree with that contention. The Commission has a large discretion in its choice of a remedy which it deems necessary to cope with the unlawful practices found, and the courts may interfere with the Commission's choice only if the remedy selected bears no reasonable relationship to such unlawful practices. * * * Commission orders are not designed to punish for past transgressions, but are designed as a means for preventing "illegal practices in the future. * * *"

"To the end that the Commission may achieve that purpose, its orders may prohibit not only the further use of the precise practice found to have existed in the past, but also,

the future use of related and similar practices. * * * Petitioners market a large number of products in Commerce. They stand adjudged guilty of the use of illegal practices in the advertisement and sale of one product. We think it is entirely reasonable for the Commission to frame its order broadly enough to prohibit petitioners use of identical illegal practices for any purpose, or in conjunction with the sale of any and all products." 278 F.2d at 342–343.

See Consumer Sales Corp. v. F. T. C., 2 Cir., 1952, 198 F.2d 404.

The Niresk case is substantially similar to the case before us. The prohibition against disparaging competing products by means of misleading advertisements should apply across the board. See F. T. C. v. Mandel Bros., 1959, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893; F. T. C. v. Ruberoid Co., 1952, 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081.[12] See also F. T. C. v. Henry Broch & Co., 1962, 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353.[13]

■■■ C. Petitioners assert that the Commission's order is void as being too indefinite as to what is a "competing product". We cannot agree. The Commission and the district court have discretion to fit the remedy to the offense. F. T. C. v. Mandel Bros., 1959, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893; see N. L. R. B. v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377. Should the occasion arise, petitioners would be able to dispute the definition and application of the words. See Jaffe, The Judicial Enforcement of Administrative Orders, 76 Harv.L.Rev. 865, 883–85 (1963).

■■■ D. This brings us to another argument of the petitioners. The complaint did not, contend the petitioners, contain a proposed order or other indication of the possible breadth which the final order assumed. There is no merit in this contention. In a similar situation, in Colgate, the court noted that the complaint is not happily phrased, but it does lay out the basic elements of the Commission's concern: the use of the mock-up resulting in deception and disparagement. As the government points out, the petitioners had ample opportunity to (and did) contest the "broad" order of the Hearing Examiner before the full Commission. See F. T. C. v. National Lead Co., 1957, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438. Moreover, the plaintiffs realized that the FTC wanted more than simply the cessation of an advertisement which had already been removed from the air. The complaint, sufficiently apprised petitioners of the matter to be litigated and the relief anticipated.

## V.

■■■ Finally, we come to the last contention of the petitioners, namely that the advertising agency should not be included within the terms of the order; as a mere agent the agency should not be held responsible for unknowingly carrying out the orders of its principal.

In Colgate-Palmolive the court had "reservations as to how far it is appropriate to go in the case of an agent," but said:

"Where, as here, the Commission was warranted in finding that the

---

12. "[T]he Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its roadblock to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." 343 U.S. at 473, 72 S.Ct. at 803, 96 L.Ed. 1081.

13. "Upon any future enforcement proceeding, the Commission and the Court of Appeals will have ready at hand interpretive tools * * * for use in tailoring the order, in the setting of a specific asserted violation, so as to meet the legitimate needs of the case. They will be free to construe the order as designed strictly to cope with the threat of future violations indentical with or like or related to the [earlier] violations * * *." 368 U.S. at 366, 82 S.Ct. at 435, 7 L.Ed.2d 353.

advertising agency was an active, if not the prime, mover, we could not say that the Commission lacked either jurisdiction or discretion. Cf. C. Howard Hunt Pen Co. v. F. T. C., supra 197 F.2d at 281; Chas. A. Brewer & Sons v. F. T. C., 6 Cir., 1946, 158 F.2d 74; see also National Cash-Register Co. v. Leland, 1 Cir., 1899, 94 F. 502, 507, cert. den. 175 U.S. 724, 20 S.Ct. 1021, 44 L.Ed. 337."

Howard Hunt Pen Co. v. F. T. C., 3 Cir.1952, 197 F.2d 273, and Chas. A. Brewer & Sons, v. F.T.C., 6 Cir., 1946, 158 F.2d 74, involved situations where the offending manufacturers had put devices in the hands of sellers whereby *they* were enabled to engage in unfair competition. Hence, the principle to be drawn from these cases is that where the alleged offender has made available resources whereby another may commit unfair acts, he is subject to an order. Here we are concerned with a different situation: Is one carrying out the will of another to be held responsible for the results of his actions? It appears to us that the proper criterion for deciding this question should be the extent to which the advertising agency actually participated in the deception. This is essentially a problem of fact for the Commission.

It is clear from the record that the advertising agency here was deeply involved. The chairman of the board of the agency testified that he himself did not know that "ultra-wet 60L" was to be used in the commercial. However, this agency had worked for Carter for years and had handled the Rise account before that product had a name. The chairman also testified his agency conceived the idea that the thing to push in advertising Rise was the wetness approach. They agreed with Carter on the motif of the program, wrote the storyboards, and assigned the job to the film producer in Hollywood.

In these circumstances, we cannot say that the Commission abused its discretion. We would suggest, however, that the effect of the order on the advertising agency should be limited to Carter's products.

Judgment will be entered setting aside the order of the Commission, further proceedings to be in accordance with this opinion.